In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 02-1347, 02-1872 & 02-4132

NABIL RAJA DANDAN, KETTY DANDAN, SOUZI DANDAN, A.K.A.
SOUZY DANDAN, SANDRA DANDAN, AND RAJA NABIL DANDAN,

*Petitioners,*

*v.*

JOHN ASHCROFT, ATTORNEY GENERAL,*

*Respondent.*

Petitions for Review of an Order
of the Board of Immigration Appeals
Nos. A29 420 614, A29 420 613,
A70 349 798, A70 349 799, A70 349 800.

ARGUED MAY 29, 2003—DECIDED AUGUST 11, 2003

---

* The Petitioners had named the Immigration and Naturalization
Service (INS) as a respondent in this action. On March 1, 2003,
the INS ceased to exist as an independent agency within the
Department of Justice and its functions were transferred to the
newly formed Department of Homeland Security. This petition for
review challenges the decisions of the Executive Office for
Immigration Review (Board of Immigration Appeals and Immigra-
tion Court), which is a component of the United States Depart-
ment of Justice. Attorney General John Ashcroft is the head of the
Department of Justice. The Attorney General, therefore, has been
listed in the caption as the sole respondent. *See* 8 U.S.C.
§ 1252(b)(3)(A) (listing as respondent the Attorney General where
removal proceedings commenced after April 1, 1997).

Before CUDAHY, EVANS, and WILLIAMS, *Circuit Judges.*

CUDAHY, *Circuit Judge.* Nabil Dandan petitions for review of the Board of Immigration Appeal's (BIA's) rejection of his asylum request and denial of his motions to reconsider and reopen. The BIA's decision to deny asylum was supported by substantial evidence. The denial of the motion to reconsider was not an abuse of discretion because there was no due process violation in the delay in instituting removal proceedings against Dandan. The denial of the motion to reopen was not an abuse of discretion because Dandan did not present facts that noted any material change in country conditions in Lebanon. We deny the petition and affirm the decision of the Board of Immigration Appeals.

## I.

The Petitioners in this case are a family unit.[1] Lead Petitioner Nabil Dandan is the husband and father of

---

[1] The government contends that the two oldest children, Souzy and Raja, who turned 21 years old during the course of this proceeding, have "aged out" so that they could no longer derivatively claim asylum based on their father's claim under 8 U.S.C. § 1158(b)(3). We disagree. 8 U.S.C. § 1158(b)(3)(B) says

An unmarried alien who seeks to accompany, or follow to join, a parent granted asylum under this subsection, and who was under 21 years of age on the date on which such parent applied for asylum under this section, shall continue to be classified as a child for purposes of this paragraph and section 1159(b)(3) of this title, if the alien attained 21 years of age after such application was filed but while it was pending.

Souzy and Raja are unmarried and therefore still qualify for derivative asylum benefits.

the family and is a native and citizen of Lebanon.[2] Ketty Dandan, the wife and mother, and the three children, Souzy, Sandra and Raja, are also natives and citizens of Lebanon. Nabil and Ketty are parents of a fourth child born in the United States in 1991.

Nabil Dandan testified that he was born in Beirut, Lebanon in 1950, and that he worked in Dubai, United Arab Emirates (UAE) as an accountant for eleven years, from 1974 to 1985. Dandan testified that the UAE cancelled the family's visas in 1985 and that they were forced to return to Lebanon. When the Dandans returned to Lebanon, that country was embroiled in a civil war that had begun in 1975. Beirut, the capital city, was divided by the "green line," east of which the Maronite Christians resided and west of which lived the Muslim part of the population. Maronite Christians are part of the Eastern Rite affiliation of the Roman Catholic Church. The Muslim portion of the population is comprised of both Sunni and Shi'ite Muslims.

Pre-civil war Lebanon was an important regional financial and commercial center. U.S. Department of State: Lebanon Report on Human Rights Practices for 1997 at 2 (Country Report or C.R.). By tradition, the President of the parliamentary republic had been a Maronite Christian, the Vice President a Sunni Muslim and the Speaker of the Chambers of Deputies a Shi'a Muslim. C.R. at 1. Fighting between the Christian and Muslim segments of the population broke out in 1975, with each side gathering private militias for its own defense. The Lebanese Christian Forces sided with the Christians in East Beirut, and the Syrian and Hezbollah forces sided with the Muslims in West Beirut.

---

[2] We will refer to the singular Petitioner or Dandan to describe all of the Petitioners as well as Nabil Dandan individually.

Dandan testified that when he returned to Lebanon in 1985, the country was mostly destroyed. He testified that, as a Maronite Christian, he and his family initially settled with relatives near East Beirut, in an area called Atchaneh, approximately 15 kilometers outside of Beirut. Dandan indicated that he later obtained a residence for his family in Beirut, presumably in East Beirut. He testified that there were no private employers available, so he found work as a civilian employee of the Lebanese Christian Forces as an accountant and tax collector. Among his duties were the keeping of the payroll for approximately 300 persons and collecting taxes from those who received protection from the Lebanese Christian Forces.

Dandan testified that he worked for the Lebanese Christian Forces in Ainrumemaneh, East Beirut, an area near the border of East and West Beirut. Dandan testified that on June 3, 1989, he was kidnaped by the Syrian forces while returning home from work. He said that he was held without food, beaten and interrogated for three days. According to Dandan, the Syrians wanted the names of those who were supporting the Lebanese Christian Forces. He testified that he gave them the information known to him, but that as a mere accountant he did not know what those of "higher political status" would know. Tr. at 69.[3]

Dandan was released after his wife paid ransom money through a Syrian mediator. He testified that on release his face "was swollen because they beat me." Tr. at 97. He said that, subsequent to his release, the family's house was shelled and partially destroyed, and that as a result, he and his family went from shelter to shelter during June and part of July 1989. At this time Dandan decided to flee Lebanon with his family. He testified that he took them at

---

[3] The transcript of the October 11, 2000 proceeding before the Immigration Judge will be designated as "Tr."

night by boat to Cyprus, where they obtained visas for the United States. The Dandans entered the United States on August 10, 1989.

A month after arriving in the United States, Dandan applied for asylum with the INS under § 208(a) of the Immigration and Nationality Act (INA). 8 U.S.C. § 1158(a). The Chicago Asylum Office interviewed Dandan in November 1996, and then referred the case to an Immigration Judge (IJ). On December 19, 1996, Dandan was issued an Order to Show Cause (OSC), charging him with deportation pursuant to 8 U.S.C. § 1251(a)(1)(B) (1994). In 1996, Congress had passed legislation changing the immigration system and rendering all unfiled OSCs void as of April 1, 1997.[4] The INS failed to file Dandan's OSC with the

---

[4] On September 30, 1996, Congress overhauled the INA with the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, 110 Stat. 3009. Several changes made by this law affect the Petitioner here. First, "deportation" proceedings, which began with an OSC, are now known as "removal" proceedings, which begin with a Notice to Appear (NTA). The effective date for such changes was April 1, 1997. IIRIRA § 309(a). As will be addressed below, because Dandan was issued an OSC before April 1, 1997, but the OSC was not filed by that date, Dandan and the government disagree about which procedure governs his case. The outcome is important for the Petitioner because the two different forms of proceedings provide two different types of discretionary relief. Suspension of deportation was a discretionary form of relief from deportation that was found in 8 U.S.C. § 1254 (1994), INA § 244. To qualify for this discretionary waiver, an alien needed to establish that he had been present in the United States for seven years prior to the filing of his application and that his deportation would result in extreme hardship to himself or to a qualifying relative. However, the IIRIRA replaced this form of relief with "cancellation of removal," which is now found at 8 U.S.C. § 1229b(b), INA § 240A(b). As will be discussed below, Dandan is not eligible for

(continued...)

Immigration Court by this date, and because the unfiled OSC was void, the Immigration Court terminated the deportation proceedings on April 3, 1997. Dandan was later issued a new document, an NTA, charging him with removal under 8 U.S.C. § 1227(a)(1)(B). After various delays, the IJ held a hearing on October 11, 2000, to consider the merits of the claim for asylum. Pursuant to 8 C.F.R. § 208.3(b), Dandan's asylum application also served as an application for withholding of removal. Additionally, pursuant to 8 C.F.R. § 208.16, Dandan's asylum application was reviewed as an application for withholding of removal under the Convention Against Torture.

The IJ denied relief under all three theories, finding that, although Dandan had testified credibly, the three-day detention did not constitute persecution within the meaning of the INA. He also found that the Country Report evidenced changed country conditions such that Dandan could no longer have an objectively reasonable, well-founded fear of future persecution within the meaning of the INA. Dandan filed a timely appeal with the Board of Immigration Appeals, which dismissed Dandan's appeal in a 2-1 decision. The BIA agreed with the IJ that the three-day detention did not constitute past persecution. The BIA also agreed that the Petitioner did not establish that he had a well-founded fear of future persecution at the time of the hearing. The BIA cited the Country Report as evidence that, because the civil war in Lebanon had ended, there was no objective basis for Dandan's belief that he would now be singled out because of his past employment with the Lebanese Christian Forces.

---

[4] (...continued)
cancellation of removal because he was not present in the United States for ten years prior to being served with an NTA as is required by the statute.

Board Member Espenoza dissented, saying that she would find that the three-day detention during which Dandan was beaten, deprived of food and interrogated rose to the level of persecution. Espenoza also noted that on a finding of past persecution, the alien is entitled to a rebuttable presumption of having a well-founded fear of future persecution. Espenoza wrote that, in her view, the record evidence did not rebut this presumption and therefore she would have granted asylum.

Dandan filed a motion to reconsider. The motion to reconsider included a new claim that the INS had violated his right to due process by taking more than six years to adjudicate the asylum application and, additionally, that the Service had violated his right to due process by not filing the OSC by April 1, 1997. The motion to reconsider was denied by the BIA. Dandan then filed a motion to reopen. This motion was also denied by the BIA. Dandan's appeal now consolidates review of the three BIA decisions: the denial of asylum, the denial of the motion to reconsider and the denial of the motion to reopen.

## II.

### A.  Asylum

This court has jurisdiction to review the order of the BIA to deny asylum under 8 U.S.C. § 1252(a)(1). We review the BIA's factual determinations under the highly deferential substantial evidence standard. *Tamas-Mercea v. Reno*, 222 F.3d 417, 422 (7th Cir. 2000); *Petrovic v. INS*, 198 F.3d 1034, 1037 (7th Cir. 2000). We may not reverse the BIA's determination simply because we believe it was wrongly decided, but rather we must be compelled by the evidence to reach that conclusion . *Tamas-Mercea*, 222 F.3d at 422; *Bradvica v. INS*, 128 F.3d 1009, 1012 (7th Cir. 1997); *Anton v. INS*, 50 F.3d 469, 472 (7th Cir. 1995).

### 1.   Past Persecution

To qualify for asylum, Dandan must show that he is a refugee within the meaning of the INA by proving that he was persecuted in the past on account of race, religion, nationality, membership in a social group or political opinion, or alternatively, by proving that he has a well-founded fear of future persecution on account of race, religion, nationality, membership in a social group or political opinion. *See* 8 U.S.C. § 1158(b)(1); 8 U.S.C. § 1101(a)(42)(A); *Ambati v. Reno*, 233 F.3d 1054, 1059-60 (7th Cir. 2000). The issue of past persecution is particularly difficult and critical here because of the presumption of a well-founded fear of future persecution that would apply if we were to find past persecution. A finding of past persecution would in fact shift to the government the burden of rebutting the presumptive fear of future persecution. *Asani v. INS*, 154 F.3d 719, 722-23 (7th Cir. 1998); 8 C.F.R. § 208.13(b)(1). And such a rebuttal would prevail only if

> any of the following is found by a preponderance of the evidence: (A) There has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution . . .; or (B) The applicant could avoid future persecution by relocating to another part of the applicant's country of nationality . . . and under all the circumstances, it would be reasonable to expect the applicant to do so.

8 C.F.R. § 208.13(b)(1)(i). Board Member Espenoza, who dissented from the BIA's findings in the present case, moved without much analysis from a finding of past persecution to an expectation of future persecution, finding that the government had not met its burden. She took this position in spite of the relative remoteness in time of the Syrian Army incident and indications of a fundamental change in the situation in Lebanon—essentially the end of the civil war in that country. This is the context, therefore,

in which we must approach the critical question whether the incident in 1989 amounted to persecution.

This Circuit has defined persecution as "punishment or the infliction of harm for political, religious, or other reasons that this country does not recognize as legitimate." *Tamas-Mercea*, 222 F.3d at 424 (quoting *Mitev v. INS*, 67 F.3d 1325, 1330 (7th Cir. 1995)); *see also Ambati*, 233 F.3d at 1060. "Although the term 'persecution' includes actions less severe than threats to life or freedom, 'actions must rise above the level of mere harassment to constitute persecution.'" *Ambati,* 233 F.3d at 1060 (citation omitted).

The government argues that the record evidence does not compel a reasonable factfinder to conclude that Dandan suffered past persecution. Resp. Br. at 20. We agree. The government contends that Dandan's one-time three-day detention, without more, "does not have the requisite level of magnitude or frequency needed to establish 'persecution' within the meaning of the [INA]." *Id.* at 21. Although the frequency issue is not dispositive, it does figure significantly in the analysis. However, this court has on occasion based a finding of past persecution on a single episode of detention or physical abuse. *See, e.g., Asani*, 154 F.3d at 723; *Vaduva v. INS*, 131 F.3d 689, 690 (7th Cir. 1997). And, as we noted in oral argument, it would hardly have been reasonable to have expected Dandan to linger in Lebanon to accumulate the additional incidents of aggravated detention that the government may deem necessary to establish persecution. While, obviously, multiple incidents create a more compelling case for finding persecution, the number of times that a petitioner has been subject to detention or physical abuse is merely one variable in the analysis of the whole of the petitioner's claim of past persecution.

However, when we look at the evidence of the severity of Dandan's single detention, we cannot say that we are

compelled to find that he was subject to past persecution. This is a high standard and one that is properly difficult to meet without powerful and moving evidence. The issue is difficult to resolve, and we find it quite serious that Dandan was detained, beaten and deprived of food for three days. But the sort of specific information that would *compel* a finding of persecution has not been presented. We know only that the detention was without food, was three days long and that he was beaten to the extent that his face became "swollen." While it is distasteful to have to quantify suffering for the purposes of determining asylum eligibility, that is our task. A standard of review that requires our being *compelled* to reach a conclusion contrary to the BIA means that we necessarily search for specifics, not generalities. Significant in our analysis is the obvious fact that knowledge of the specific circumstances of Dandan's detention was entirely within his control. Dandan's case for past persecution, with all its procedural ramifications that we have noted, rests wholly upon the specific circumstances of a single aggravated detention—circumstances he alone could have, but failed to provide. Because Dandan bears the burden of demonstrating that his detention rises to the level of persecution, we must hold against him the failure to provide sufficient specifics to compel our assent. A three-day interrogation resulting in a "swollen" face does not compel us to conclude that the BIA was incorrect.

A cursory examination of our past jurisprudence demonstrates that Dandan's single detention is distinguishable from precedents for finding past persecution. In *Asani*, for example, we held that being detained and beaten by the police, who in the process knocked out two of Asani's teeth, was sufficient to show past persecution. *Asani*, 154 F.3d at 722-23. Similarly, in *Vaduva*, this court agreed with the BIA's finding that a single beating in which a petitioner was punched, had his face bruised and his finger broken constituted past persecution. *Vaduva*, 131 F.3d at 690.

Dandan's detention, as he has related it, does not quite rise to this level. It is more akin to the detention in *Skalak v. INS*, 944 F.2d 364 (7th Cir. 1991), where the petitioner was detained twice for interrogation, each time for three days. We do not hold that lost teeth or broken bones are the *sine qua non* of persecution, but these specifics indicate the severity of the beating and support its claim to be considered persecution. There are no similar specifics presented by Dandan. Looking at the totality of the circumstances of the detention, as Dandan has described them, we see nothing that compels us to reject the BIA's determination.[5]

Were we to conclude to the contrary, and agree with the dissent to the BIA's decision that Dandan's detention constituted past persecution, the burden of rebutting the consequent presumption of future persecution would, as we have indicated, have fallen to the government, and we would have been compelled to remand to the BIA for a determination on that matter. *See INS v. Ventura*, 537 U.S. 12 (2002). But, since there appears to be abundant evidence of changed circumstances,[6] there is good reason to believe that the government would be able to meet its burden, with the ultimate consequence that asylum would still be denied.

---

[5] Dandan also alleged that his house was purposefully shelled and destroyed by the Syrian Army subsequent to his release from detention, but we do not find this fact relevant because of the likelihood that the shelling was a random occurrence incident to the civil war. Dandan points to no evidence in the record to the contrary.

[6] At present, an American army stands at Syria's back door—yet another circumstance that may be affecting Syrian policy. *See* Dexter Filkins, *With U.S. in Neighborhood, Syria Eases Its Grip,* N.Y. Times, July 23, 2003, at A4.

2.  Well-founded Fear of Future Persecution

Additionally, an examination of the Country Report for 1997 provides substantial evidence to support the BIA's finding that Dandan does not have a well-founded fear of future persecution. The ending of the civil war has restored physical security to parts of the country. The Country Report indicates that Lebanese Christians can settle in and around Beirut without fear of persecution for their religion. The country's government, which contains strong representation of Maronite Christians, was reconstituted with the cessation of the civil war. While it is true that Syrian forces continue to control parts of the country, their presence is not pervasive. In its totality, we cannot say that we are compelled to conclude that the BIA was incorrect in its finding.[7]

B.  Motions to Reconsider and Reopen

The decision of the BIA to grant or deny a motion to reconsider or a motion to reopen is reviewed for abuse of discretion. 8 C.F.R. § 1003.2(a). Dandan's motion to reconsider argued that the government's failure to timely file his OSC with the IJ deprived him of the opportunity to apply for suspension of deportation and was therefore a violation of due process. The question whether an immigration hearing violates due process is purely a legal issue, which we review de novo. *Kerciku v. INS*, 314 F.3d 913, 917 (7th

---

[7] Because the burden of proof for withholding of removal and relief under the Convention Against Torture is higher than the burden for asylum, a lack of eligibility for asylum necessarily means the BIA's rejection of Dandan's additional claims for relief was also not clearly erroneous. *See* 8 C.F.R. § 208.16(c)(2) (explaining that the burden of proof is "more likely than not" that petitioner will be persecuted or tortured).

Cir. 2003). But, Dandan's due process claim must fail, and the denial of his motion to reconsider was proper.

It is well established that the Fifth Amendment entitles aliens to due process in deportation hearings, *Reno v. Flores*, 507 U.S. 292, 306 (1993), but a claim for a violation of due process requires that the claimant possess a protected liberty or property interest that potentially could be abridged. *Morales-Ramirez v. Reno*, 209 F.3d 977, 983 (7th Cir. 2000). Dandan argues in his brief that "[t]he INS should have interviewed the Petitioners on their request for asylum in a timely fashion . . . [and that] [t]he INS should have filed the Orders to [S]how Cause with the Immigration Court in a timely fashion, i.e., prior to April 1, 1997." Pet. Br. at 24. But, the decision when to commence deportation proceedings is within the discretion of the Attorney General and does not, therefore, involve a protected property or liberty interest. *Morales-Ramirez*, 209 F.3d at 983. As such, Dandan's due process argument does not get off the ground.

Dandan's due process and suspension of deportation arguments are inextricably linked. Dandan argues that because the INS did not timely file his OSC, he was denied the statutory protection of a suspension of deportation. But the IIRIRA and its accompanying regulations make clear that Dandan is and was, after April 1, 1997, ineligible for suspension of deportation. Deportation proceedings commence when the INS files a charging document, currently a Notice to Appear for removal proceedings, with the Immigration Court. 8 C.F.R. § 3.14(a); *Morales-Ramirez*, 209 F.3d at 983.[8] Even under the pre-IIRIRA regulations, "[e]very proceeding to determine the deportability of an

---

[8] There is some disagreement among the circuits as to when deportation proceedings actually commence. We have already addressed this issue at length in *Morales-Ramirez*, and we refer interested readers there for further explanation. *Morales-Ramirez*, 209 F.3d at 981-83.

alien in the United States is commenced by the filing of an order to show cause with the Office of the Immigration Judge." 8 C.F.R. § 242.1(a) (*repealed*). Therefore, the *issuing* of the OSC on December 19, 1996, was ineffective; it did not initiate Dandan's deportation proceedings. Dandan had no "right" to consideration of his suspension of deportation application because he was not in deportation proceedings. Dandan's proceedings did not commence until the NTA was filed with the IJ on August 20, 1997. Accordingly, he is subject to the permanent rules of the IIRIRA. *See Jimenez-Angeles v. Ashcroft*, 291 F.3d 594, 600 (9th Cir. 2002). Because he was not physically present for ten years prior to being served with the NTA, Dandan is ineligible for a cancellation of removal—the current incarnation of what was formerly suspension of deportation. Because there was no violation of Dandan's due process rights, it was not an abuse of discretion for the BIA to deny Dandan's motion to reconsider.

Similarly, we do not find an abuse of discretion in the BIA's denial of the motion to reopen. The new evidence presented by Dandan does not comprise a compelling case that the situation in Lebanon is markedly different than at the time of his original hearing. Documentary evidence of Syrian occupation in parts of Lebanon, Hezbollah's ongoing conflict with Israel and Syrian unwillingness to tolerate political dissent in areas under its control is all reflected in the Country Report upon which the BIA made its original decision. The BIA properly denied the motion to reopen for failing to establish a prima facie case for asylum. *See Awad v. Ashcroft*, 328 F.3d 336, 341 (7th Cir. 2003).

## III.

For the foregoing reasons, we DENY the petition for review. The Board of Immigration Appeals decision is AFFIRMED.

A true Copy:

   Teste:


                    _____
                    *Clerk of the United States Court of*
                    *Appeals for the Seventh Circuit*