**Hafeez AHMED, Petitioner,**

v.

**John ASHCROFT, United States Attorney General, Respondent.**

No. 03–1872.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 28, 2004.

Decided April 2, 2004.

Kenneth Y. Geman, Ronald H. Ng, Chicago, IL, for Petitioner.

George P. Katsivalis, Department of Homeland Security, Office of the District Counsel, Chicago, IL, Margaret J. Perry, Department of Justice, Washington, DC, for Respondent.

Before MANION, DIANE P. WOOD, and EVANS, Circuit Judges.

### ORDER

Hafeez Ahmed seeks political asylum claiming past persecution and a fear of future persecution based on his and his family's affiliation with high-ranking members of the People's Pakistan Party (PPP), including the former prime minister of Pakistan, Benazir Bhutto, and her husband Ali Asif Zardari. Despite the fact that in 1992 Ahmed was kidnaped, beaten, and stabbed because of his affiliation with the PPP, the immigration judge (IJ) found that Ahmed had not suffered past persecution. The Board of Immigration Appeals (BIA) affirmed the IJ's decision. The evidence compels us to disagree with the IJ and conclude instead that Ahmed did suffer past persecution. We thus grant the petition for review and remand for further proceedings.

Ahmed is a citizen of Pakistan. He and his family have maintained close personal ties with high-ranking members of the PPP since the party's inception in the 1960's. The PPP governed Pakistan intermittently during the last several decades, with Zulfikar Ali Bhutto serving as prime minister from 1973 until 1977, and his daughter Benazir Bhutto serving as prime minister from 1988 until 1990 and again from 1993 until 1996. Ahmed claims association with the Bhutto family and the family of Benazir Bhutto's husband, Ali Asif Zardari. Ahmed's father was a close friend and political advisor of the elder Bhutto, and Ahmed and his family lived in a home and shared a common wall with the Zardari family in Ahmed's home town of Nawad Shah, Sindh. When the PPP lost power in the late 1970s, the elder Bhutto was executed and Ahmed's father was jailed and tortured for a month. Ahmed himself has been active in the party since he was in high school, though he has never held an official position.

The most relevant events for Ahmed's claim happened over a decade after his father's persecution. Bhutto's daughter Benazir became the prime minister in 1988 and served in that position for two

years. In 1990 a coalition called the Islamic Jamhoori Ittehad (IJI) took control of the government, and the PPP became the opposition party. *See* U.S. Dep't of State, *Pakistan–Profile of Asylum Claims and Country Conditions,* at 11 (1997). For the next three years while the IJI ruled Pakistan, PPP activists were denied due process and mistreated by the police. *Id.* at 11–12.

Ahmed presented evidence that in 1992 his brother, Naimat Abbas, was kidnaped and tortured by members of the Mohajir Quami Movement (MQM), a group that was part of the ruling IJI coalition government. Ahmed testified to what he knew about Abbas's kidnaping and he also submitted his brother's sworn statement. In addition to describing a brutal beating that left him near death, Abbas related threats that his abductors had directed at his family. Abbas wrote: "Throughout my ordeal, my abductors spoke about how they would kill me and all other PPP members and Bhutto supporters who fell into their hands.... They told me that they would make me and my family sorry for our association with Asif Zardari." In May 1992, according to Abbas's statement and Ahmed's testimony, PPP opponents tried again to kill Abbas, but he was able to escape.

That same month, Ahmed and his cousin were kidnaped by MQM members. Ahmed described the incident both in his written submission and again at the hearing. In his written submission he said:

> [M]embers of the MQM came to our house again. Naimat wasn't there, but they took Waseem and I. They sodomized both of us and terrorized us for along [sic] time. I cannot even explain the horror of what they inflicted. However, their cruelty did not end with such abuse. I was stabbed in the leg and in the stomach. The MQM members

threatened to kill both of us. I am certain that both of us would have been killed if we didn't escape by jumping out the window. I suffered terrible and severe injuries from the fall and had to be hospitalized for many weeks.

Ahmed provided a more complete story in his oral testimony, but he did not mention the sodomy or injury to his leg. Ahmed testified that four MQM members went to his home in Nawad Shah at 8:30 in the evening. He said: "Somebody knocked on the door. I came out. There were 4 people of (indiscernible) party. They took out a pistol. They put the pistol against my body and threw my body in their car, in the van. Me and my cousin, Wasim." Ahmed testified that the men blindfolded the cousins and took them to a house and up to the second floor. He went on:

> At that time they tied our hands in the back of the chair and opened our eyes— took the—off and started beating us. We wanted to tell you that your party is not going (indiscernible). (Indiscernible) then put a knife in my right stomach. They left us and they went downstairs and I was still bleeding profusely. After one and one-half hours they came upstairs. Regardless of that I was still bleeding they started beating me. And on 3 o'clock in the morning then back downstairs again.

Ahmed explained that he and his cousin managed to untie each other and escape. He said that he spent three weeks in the hospital recovering from his injuries. In support of his testimony about his injuries, Ahmed introduced a 1999 doctor's report from Evanston Hospital verifying that he had an irregular scar in the left lower quadrant of his abdomen and multiple scars on his leg that are "consistent with the history of torture and knife lacerations he reportedly endured approximately seven years ago in Pakistan."

Ahmed did not flee immediately after his May 1992 kidnaping, but at his hearing before the IJ he offered some explanation of why he stayed. Soon after the kidnaping, violence in the province of Sindh generally decreased. Indeed, the State Department's 1997 profile reported that "in March 1992 ... routine round-ups of PPP supporters in Sindh declined." The decrease in violence explains why Ahmed did not flee immediately. By October 1993, 18 months after his kidnaping, the PPP was back in power and Benazir Bhutto again became the prime minister. For almost three years, according to the U.S. State Department, members of the PPP were generally free from persecution. *See* U.S. Dep't of State, *Pakistan–Profile of Asylum Claims and Country Conditions*, at 12 (1997). Ahmed was able to finish medical school during this time and begin his career as a surgeon.

The PPP's return to power was short-lived. Less than three years after the PPP regained control of the government, the party's power began to erode. *See* U.S. Dep't of State, *Pakistan–Profile of Asylum Claims and Country Conditions*, at 12 (1997). At the end of 1996, public criticism against the Bhutto government mounted. Fearing a repeat of what happened to him the last time the PPP lost control of the government, Ahmed and his family fled to the United States in September 1996. Two months later, in November 1996, Pakistan's president dismissed Bhutto from her office as prime minister, citing charges of corruption and mismanagement.

A "caretaker government" ruled Pakistan from November 1996 until February 1997. Then elections were held and the Pakistan Muslim League formed a coalition government, of which the MQM were a part. In July 1997 the U.S. State Department said that the PPP was fully participating in the government as the "princi-

pal opposition party." As of that date, the Department had "not seen evidence of political reprisals." In 1999 General Pervez Musharraf led a coup and took control of the government. Although critical to an analysis of whether Ahmed will face persecution if he returns, the PPP's relationship with Musharraf's government is not entirely clear from the record. Ahmed testified that he fears persecution from the military government because members of the PPP have remained in custody since the coup. Ahmed testified: "We are very much afraid of this military government as well because they have not released any of our People's Party workers." He also submitted the State Department's 1999 Country Report, which states that the Musharraf government has arrested members of the PPP.

At the close of the hearing, the IJ concluded that Ahmed had not demonstrated past persecution or a well-founded fear of future persecution. The IJ focused particularly on the fact that Ahmed's initial application suggested that he was kidnaped in 1996 and that he fled shortly after the kidnaping, while his testimony revealed that the kidnaping actually occurred in 1992. The IJ found it noteworthy that Ahmed remained in Pakistan several years after his detention and never held a high position in the PPP. The BIA affirmed the IJ's order with a short order of its own, also focusing on the discrepancy in the date of the kidnaping, the fact that Ahmed did not flee immediately after the kidnaping, and the fact that he never held a high position in the PPP. The BIA said that there was support for the IJ's conclusion that Ahmed exaggerated his claim. Ahmed filed a motion to reconsider with the BIA, but the BIA refused in a cursory order. This court reviews the IJ's order, as supplemented by the BIA opinion. *Niam v. Ashcroft*, 354 F.3d 652, 655–56 (7th Cir.2004).

If a petitioner proves that he has endured past persecution, the IJ must presume that the petitioner will face future persecution. *Capric v. Ashcroft*, 355 F.3d 1075, 1084 (7th Cir.2004). The government can rebut that presumption by proving by a preponderance of the evidence that: (1) there has been a fundamental change in circumstances to dissipate the danger to the petitioner; or, (2) the petitioner could avoid persecution by relocating to another part of his country. 8 C.F.R. § 208.13(b)(1)(i)(B); *Dandan v. Ashcroft*, 339 F.3d 567, 573 (7th Cir.2003).

The IJ gave several reasons for concluding that Ahmed had not suffered past persecution, a ruling that we would uphold if it were supported by substantial evidence. *See Medhin v. Ashcroft*, 350 F.3d 685, 689 (7th Cir.2003). First, the IJ made several broad comments that he found Ahmed not credible. He said: "the affidavit [presumably Ahmed's sworn personal statement] ... paints the respondent's facts in a harsh and bleak manner in order to enhance his claim. The facts appear to be exaggerated and are inaccurate." The government thus argues that the IJ's conclusion about past persecution turned on an adverse credibility determination for which there is substantial support in the record. However, despite the IJ's overall adverse credibility determination, a fair reading of the order suggests that the credibility assessment was not connected to the ultimate conclusion about past persecution. It appears that the IJ *believed* Ahmed about the kidnaping, but simply thought that the incident did not rise to the level of persecution:

> While this Court recognizes that the respondent may have been kidnaped by four people from the MQM and threatened and also stabbed, I find based upon the totality of the facts in this case that, that incident does not rise the [sic] level of past persecution. The respondent received medical treatment, filed a complaint with the police, however ineffective, and remained in Pakistan for a number of years after the incident.

Later, the IJ summarized his holding by saying: "while this Court recognizes that [Ahmed] may have been physically abused in 1992 by MQM Party supporters, I do not find that, that fact is sufficient to establish past persecution." So, although the IJ could have couched his conclusions about past persecution in terms of credibility, for example by saying that he disbelieved Ahmed's story or parts of it, the order does not say that or leave that general impression. The single "inaccuracy" was the discrepancy in dates of the kidnaping, and the "exaggeration" was the resulting impression that Ahmed fled Pakistan shortly after the incident.

The IJ gave other reasons for finding no past persecution, but none of them provides substantial evidence for his conclusion. The IJ pointed out that Ahmed "remained in Pakistan for a number of years after the incident," and obtained a medical degree. These observations are problematic for a number for reasons. To begin, the IJ seemed to place an inordinate amount of significance on these facts. While Ahmed's behavior after the incident is relevant for assessing his fear of future persecution, it is less relevant for assessing whether his kidnaping rises to the level of persecution. That aside, Ahmed provided some explanation about why he remained in Pakistan for those years. For the first year-and-a-half that he stayed, violence had subsided. Then, the PPP regained power and Ahmed was again enjoying all the benefits of his affiliation with the party. He would have no reason to flee while his party was prospering. *See Niam*, 354 F.3d at 658 (a person who anticipates improvement in the political landscape is not expected to flee). So,

Ahmed's delay in fleeing the country was for reasons that seem to have escaped the notice of the IJ.

The IJ also said that the kidnaping was not persecution because Ahmed was able to receive medical treatment and "file[ ] a complaint with the police, however ineffective." If anything, the fact that Ahmed received medical treatment demonstrates that his injuries were severe. Regarding the police report–Ahmed was unable even to file a report until a contact in the police force helped him. Nothing came of the report, though, except that the officer who took it was apparently kidnaped and murdered by the MQM. These details bolster Ahmed's claim that he was persecuted.

The facts of Ahmed's kidnaping reveal that it did rise to the level of persecution. Ahmed was beaten, stabbed with a knife in his stomach, left to bleed for over an hour, and then beaten again. He might have also been sodomized and stabbed in the leg. His injuries were so serious that he spent three weeks in the hospital and has lasting scars. In *Dandan*, we attempted to describe the line between "mere harassment," which is not persecution, and "punishment or the infliction of harm for political, religious, or other reasons that this country does not recognize as legitimate." *Dandan*, 339 F.3d at 573. Dandan himself was held without food, beaten to the point that his face became swollen, and interrogated for three days. In affirming the IJ's decision that the incident did *not* rise to the level of persecution, we contrasted the facts of that case with those in *Asani v. INS*, 154 F.3d 719 (7th Cir.1998), a case in which the claimant's persecution included being beaten until two of his teeth were knocked out, and *Vaduva v. INS*, 131 F.3d 689 (7th Cir.1997), a case finding that a single beating that resulted in broken fingers rose to the level of persecution. The *Dandan* court said that the case before it was different because Dandan had not sufficiently described his beatings or injuries to persuade the IJ or the court that his treatment rose to the level of persecution. The *Dandan* court explained its holding by saying "We do not hold that lost teeth or broken bones are the *sine qua non* of persecution, but these specifics indicate the severity of the beating and support its claim to be considered persecution." *Dandan*, 339 F.3d at 574. This case is more like *Asani* and *Vaduva* than like *Dandan*: Ahmed has provided explicit details about his beating and the serious injuries he endured.

Because we find that Ahmed suffered past persecution, we grant the petition for review and remand for further proceedings. Our finding of past persecution effectively shifts "to the government the burden of rebutting the presumptive fear of future persecution." *Dandan*, 339 F.3d at 574.