ROVNER, Circuit Judge,
Dissenting.
I respectfully dissent. The IJ found Emini credible and found that her testimony was supported by corroborating documents, leaving only the question of whether the incidents she described amount to past persecution or support a well-founded fear of future persecution. As the majority notes, to constitute past persecution the acts in question must rise to a level above mere harassment: they must threaten death, imprisonment, or substantial harm or suffering beyond being merely unfair, unjust, or unlawful. Bod v. Gonzales, 473 F.3d 762, 766 (7th Cir.2007); Margos v. Gonzales, 443 F.3d 593, 596 (7th Cir.2006); Dandan v. Ashcroft, 339 F.3d 567, 573-74 (7th Cir.2003). Emini’s evidence must be specific in its descriptions of the type of harms she suffered in order to prove that the treatment was severe enough to constitute persecution. Dandan, 339 F.3d at 573-74.
Here, the record more than adequately supports these requirements: Emini was imprisoned, she was credibly threatened with death, and she did suffer in a way that surpassed unfairness and entered the realm of political subjugation. She described all these events with sufficient clarity and specificity for the IJ to find that they happened just as she described them. The majority is willing to admit that the record indeed supports a determination of persecution; I believe it compels that result, requiring that this court grant Emini’s petition, vacate the decision of the BIA, and remand for a new hearing in which Emini would be properly afforded a presumption of a well-founded fear of future persecution. See Bod, 473 F.3d at 766; Bejko v. Gonzales, 468 F.3d 482, 485 (7th Cir.2006).
The pattern of harms suffered by Emini is key to understanding the seriousness of the situation she faced in Albania. When *819 one couples the undisputed facts of her detentions and mistreatment (including several events of significant physical violence) with (1) the steadily escalating nature of the abuse, (2) the explicit threats that she should discontinue her political activity, and (3) the continuing official interest in her, as evidenced by the warrants delivered to her home just before she fled, the finding of political persecution is inescapable. The socialist Albanian authorities communicated a clear message (stop your opposition) and backed it up with detentions and mistreatment. The police, knowing of her organizational role among the student members of the Democratic Party, routinely and systematically sought her out, detained her, and abused her in an attempt to learn about upcoming party rallies and events so that they could quell broader political expression. Through both explicit threats of more serious reprisals and an escalating pattern of abuse, they warned her that if she did not stop, she would suffer worse treatment than she already had. This worsening trend was apparent in the years before she fled: in 1998 she was detained for a half hour and pushed against a wall; in 1999 she was detained for 20 hours, dragged by her hair, slapped in the face, and beaten and bruised by “rubber sticks;” in 2000 she was detained for three days and punched in the face, necessitating that she miss school and receive medical attention for her injuries. This increase in severity was accompanied by threats on her life, such as “you’ll die in jail” and “you’ll get it in the neck,” and also threats of prolonged imprisonment and of forced prostitution that she believed had already been carried out on her first cousin. These threats were entirely credible in the context of her worsening abuse.
Consequently, no reasonable person in Emini’s position could have thought that she was free to continue participating in political opposition without risking more grave physical injury or detention than she had already experienced. The majority itself acknowledges this. Yet the majority in essence requires that she wait until she was even more severely beaten or incarcerated even longer before she could claim she was politically persecuted. A need to show more severe treatment might be plausible if the mistreatment were occurring at random and with no explicit message that it would worsen if she continued her political activity. But when the handwriting was so clearly on the wall, Emini was not obligated to ignore it.
The socialist authorities ultimately achieved exactly what they sought: the suppression of Emini’s political expression. Initially when she was imprisoned multiple times and beaten, she still continued in her opposition. The record shows that for years Emini was willing to persevere even through increasing physical harm, accepting that her harms were collateral for her cause. But finally she became certain that the harm resulting from her continued expression would be more than she could bear, and she fled Albania. The authorities succeeded by pushing her to the limit of what she was willing to risk: her life. And yet the majority seems to find that inadequate for asylum. While it is inescapable that we must sometimes engage in a grotesque calculation of a petitioner’s harm to determine if it is severe enough to warrant asylum, see Dandan, 339 F.3d at 573-74, I fear that in this case the majority has set the bar too high. It engages in an overly-demanding search for specificity and severity, a formalism that undermines the purpose and function of our asylum law in cases in which the causal connection between political expression and inflicted harm is so high, and the clarity of increased future severity is apparent from context. If Emini’s case does not warrant asylum, then it becomes very hard to identify just what does. The danger of this *820 uncertainty extends beyond the fate of a single petitioner; it tends toward incongruous results that can give the appearance of asylum as judicial fiat rather than the promise of our government to the oppressed.
Because the record compels the conclusion that Emini’s experiences amount to past persecution, she is therefore entitled to a presumption of a well-founded fear of future persecution should she be returned to Albania. I would grant her petition for review, vacate the decision of the BIA, and remand for a new hearing in which she would receive the benefit of that rebuttable presumption.