[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCT 23, 2008
THOMAS K. KAHN
CLERK

_____

No. 06-13736

_____

Agency Nos. A95-241-206
A95-907-480

DIDIER ADOLFO VARON,
PAOLA FERNANDA ACOSTA,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(October 23, 2008)**

Before BIRCH, CARNES and COX, Circuit Judges.

BIRCH, Circuit Judge:

Didier Adolfo Varon ("Varon") and his wife, Paolo Fernanda Acosta-Alvarez ("Alvarez") petition this court for review of the final order of the Board of Immigration Appeals ("BIA") affirming the Immigration Judge's ("IJ") denial of their consolidated application for asylum and withholding of removal under the Immigration and Naturalization Act ("INA"), 8 U.S.C. § 1101 et seq. After review, we deny the petition.

## I. BACKGROUND

Varon and Alvarez are natives and citizens of Colombia. Varon was admitted to the United States on or about 22 February 2001, as a nonimmigrant visitor for pleasure with authorization to remain until 20 February 2002.[1] On the day he was scheduled to depart, Varon filed an application seeking asylum and withholding of removal under the INA and relief under the Convention Against Torture ("CAT")[2] alleging persecution based on political opinion. Specifically, he contended that he was persecuted because he opposed the use of force and violence

---

[1] In April 2002, the Department of Homeland Security (formerly the Immigration and Naturalization Service) issued Varon and Alvarez Notices to Appear ("NTA"), charging them with removability under INA § 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B), as immigrants who remained in the United States for a period of time longer than permitted. Varon appeared before the IJ with counsel, admitted the factual allegations contained in the NTA, and conceded removability.

[2] The petitioners do not raise any challenge in their brief to the BIA's denial of protection under the CAT and have thus abandoned this claim. See Sepulveda v. United States Att'y Gen., 401 F.3d 1226, 1228 n.2 (11th Cir. 2005) (per curiam) ("When an appellant fails to offer argument on an issue, that issue is abandoned.").

2

by guerrilla groups in Colombia between 1996 and 2001 and feared being kidnaped or killed if he returned.[3]

While obtaining his engineering degree at the Universidad de Valle in Cali, Colombia, Varon actively opposed the use of force and violence by the Revolutionary Armed Forces of Colombia ("FARC") and the Revolutionary Student Front ("FER"), the FARC's political allies inside the University.[4] According to Varon, those who were not openly leftist were considered to belong to the right wing. In 1996, Varon organized meetings throughout the University and formed a student group to take a stand against the violence. It was Varon's opposition to leftist tactics that brought him to the attention of the FER, who told him on several occasions "to shut his mouth up" or they would "silence" him. In a 26 May 1996 "Announcement," the FER urged the university community "to denounce those so-called 'students' like Didier Varon," whose goal was to "subjugate the . . . fight" against imperialism. That same year, the FER kidnaped Varon and detained him in a classroom for an entire day, threatening him and

---

[3] Alvarez also filed an application for asylum, relying exclusively on the claims raised in Varon's application.

[4] Because the IJ found Varon to be credible, we accept the facts set forth in his asylum application and testimony as true for purposes of evaluating his asylum claim. See Niftaliev v. U.S. Atty. Gen., 504 F.3d 1211, 1216 (11th Cir. 2007) (holding that where the IJ finds the petitioner to be credible, his testimony must be accepted).

3

accusing him of being a paramilitary. His kidnaping became a symbol for the students against violence and generated tension with the FER.

Following this incident, Varon continued to hear rumors and read graffiti saying that he would be killed. He believed he was considered a paramilitary because he never accepted leftist ideas. One night in May of 1999, as he was leaving the University campus, an unidentified person threw a Molotov cocktail[5] at him from one of the buildings. Although Varon could not see who threw the bomb, he believed the assailant was a member of the guerrilla groups, who were "offended" by his organization of the student group against violence in 1996. Varon suffered only minor injuries as a result of the incident, but was "very much afraid" and decided to travel to the United States to live with relatives. He spent two and a half months in the United States before returning to Colombia in August 1999 to finish his education.

After returning to Colombia, Varon resumed participation in an ecological group, "Halcones Turismo de Aventura," with which he had been affiliated since 1991 and whose mission was to restore and replant Colombia's tropical forests. In November 2000, while on an ecological outing in a FARC-controlled area, the group was stopped by heavily-armed FARC guerrillas who warned them to cease

---

[5]A "Molotov cocktail" is a small home-made bomb consisting of a bottle filled with gasoline, plugged with a rag, ignited, and thrown as a grenade.

"working with the community" and ordered them to pay a tax for entering the area. When Varon and another member asked why they had to pay money when they were a non-profit ecological group, the FARC members became angry and responded that the group would be detained and subjected to a "political trial." At that point, the FARC kidnaped Varon and the others and forced them to march through the forest for seven hours until they reached a remote camp, where the FARC confiscated their identification cards, threatened them at gun-point, and tied them to a tree.

Approximately four hours later, a member of the FARC returned and told Varon that the FARC knew he had opposed their activities at the University and were going to kill him because he was spying on their activities in the mountains. He tried to explain that he was not part of the military forces or any paramilitary group and was only in the mountains to plant trees. The FARC released Varon after thirty-six hours, but warned him that they would be continuing their investigation into his life and if they ever saw him again in the area he would be killed immediately.

Varon attempted to report the incident to his local police, but was told he would have to file the report where the detention occurred. Varon indicated that he would never return to that area. About one week later, a member of the FER approached Varon on the university campus, told him he was aware of what had

happened in the mountains, and warned him that the more radical members of the group were going to kill him because they believed he was an "infiltrator of the paramilitary." Varon did not return to the mountains or the university. He contacted his professors, had all of his course work sent to him by email and telephone, and went to live with Alvarez, who was his girlfriend at the time. He received his degree in January 2001, but did not attend the graduation ceremony.

Despite Varon's efforts to keep a low profile, a person who identified himself as a member of the FARC called his brother's house, where he had been living before, and stated that the FARC knew Varon was a member of the paramilitary. After Alvarez's parents started receiving similar threatening phone calls, Varon fled Colombia for the United States. He did not attempt to relocate to another part of Colombia because he believed that the guerrillas would be able to find him using the information from his identification card.

Also admitted into evidence were, inter alia, several news articles reporting on the growing number of attacks against students and academics as well as the general unrest at public universities in Colombia, and the State Department's 2001 and 2004 Country Reports on Human Rights Practices for Colombia. According the 2001 Country Report, the FARC was well-known for attacking civilians and committing massacres and summary executions. The report further noted that the FARC guerillas commonly targeted local elected officials, teachers, civic leaders,

6

business owners, religious leaders, and other civilians, and were responsible for the majority of kidnapings for political reasons as well as for ransom payments, which were an integral source of revenue for the group. Both guerrilla and paramilitary groups maintained a presence at many universities, and the groups were reported to use both violent and nonviolent means in order to generate political support for their respective campaigns. The 2004 Country Report contained similar information, noting additionally that while the total number of kidnapings had declined, the kidnapings for ransom and political reasons remained a serious problem.

The IJ found that Varon was credible, but concluded that the mistreatment he suffered did not amount to past persecution. The IJ also found that while Varon had a subjectively genuine fear of persecution, the fact that he returned to Colombia following the Molotov cocktail incident, resumed his regular activities, and completed his education, undermined any objectively reasonable fear of persecution. Inasmuch as Varon failed to carry his burden with respect to his asylum claim, the IJ found that he also failed to meet the higher burden for obtaining withholding of removal.

The BIA affirmed, finding that Varon's experiences, while disturbing, did not rise to the level of past persecution. The BIA concluded additionally that Varon did not have a well-founded fear of future persecution because he was

unable to show that the FARC or the FER was currently looking for him on account of his political opinion, or that they would single him out for persecution some four years after he had left Colombia. Varon now seeks review of the BIA's decision denying relief.

## II. DISCUSSION

"We review only the BIA's decision, except to the extent that it expressly adopts the IJ's opinion." Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001). Because the BIA issued its own opinion and did not expressly adopt the IJ's findings, we review only the BIA's decision. To the extent that the BIA's decision was based on a legal determination, our review is de novo. D-Muhumed v. United States Att'y Gen., 388 F.3d 814, 817 (11th Cir. 2004). Findings of fact are reviewed under the substantial evidence test, which requires us to affirm the BIA's decision if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." Forgue v. United States Att'y Gen., 401 F.3d 1282, 1286 (11th Cir. 2005). Under this highly deferential standard, we view the record in the light most favorable to the BIA's decision and are bound by that decision unless a reasonable adjudicator would be compelled to conclude to the contrary. Adefemi v. Ashcroft, 386 F.3d 1022, 1026-27 (11th Cir. 2004) (en banc). Accordingly, "even if the evidence could support multiple

8

conclusions, we must affirm the agency's decision unless there is no reasonable basis for that decision." Id. at 1029.

An alien who arrives in or is present in the United States may apply for asylum. See INA § 208(a)(1), 8 U.S.C. § 1158(a)(1) (2008). The Attorney General or Secretary of Homeland Security has discretion to grant asylum if the alien satisfies his burden of establishing that he is a "refugee." See INA § 208(b)(1), 8 U.S.C. § 1158(b)(1). A "refugee" is defined as:

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A). The alien has the burden of proving with "credible, direct, and specific evidence in the record" that he is a refugee. Forgue, 401 F.3d at 1287. To establish eligibility for asylum, the alien must, with specific and credible evidence, show that he was persecuted in the past, or has a well-founded fear that he will be persecuted in the future, on account of his race, religion, nationality, membership in a particular social group, or political opinion. 8 C.F.R. § 208.13(b) (2008); Al Najjar, 257 F.3d at 1287.[6] If the alien establishes past

---

[6] "The statutes governing asylum and withholding of removal protect not only against persecution by government forces, but also against persecution by non-governmental groups that the government cannot control, such as the FARC." Ruiz v. United States Att'y Gen., 440 F.3d

persecution, it is presumed that his life or freedom would be threatened upon returning to that country. 8 C.F.R. § 208.13(b); see Tan v. United States Att'y Gen., 446 F.3d 1369, 1375 (11th Cir. 2006). The government may rebut this presumption by showing by a preponderance of the evidence that the country's conditions have changed such that (1) the applicant's life or freedom no longer would be threatened upon removal, or (2) the alien could relocate within the county and it would be reasonable to expect him to do so. 8 C.F.R. § 208.13(b).

An alien who has not shown past persecution may still be entitled to asylum if he can demonstrate a well-founded fear of persecution on a protected ground by presenting "specific, detailed facts showing a good reason that he or she will be singled out for persecution on account of" the statutorily listed factor. Sepulveda, 401 F.3d at 1231 (quotations omitted); 8 C.F.R. § 208.13(b)(2). To prevail, the applicant must demonstrate that his fear of persecution is both subjectively genuine and objectively reasonable. See Al Najjar, 257 F.3d at 1289.

Persecution, both past and future, must be "on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(42)(A). An applicant may establish persecution based on one of these five protected grounds by showing that the "persecution was, at least in part, motivated

1247, 1257 (11th Cir. 2006).

by a protected ground." <u>Tan</u>, 446 F.3d at 1375; <u>see</u> <u>Rivera v. United States Att'y Gen.</u>, 487 F.3d 815, 821 (11th Cir. 2007) ("So long as an applicant for asylum proves . . . persecution on account of a protected ground, it matters not that his or her persecutors may have additional motives for their actions."). Although the persecution must be based upon the political opinion of the victim, not the political opinion of the persecutor, we have recognized that an applicant may establish past persecution based on an imputed political opinion that is either correctly or incorrectly attributed to him. <u>See</u> <u>Sanchez v. United States Att'y Gen.</u>, 392 F.3d 434, 437-38 (11th Cir. 2004) (per curiam); <u>see also</u> <u>Al Najjar</u>, 257 F.3d at 1289 ("An asylum applicant may prevail on a theory of imputed political opinion if he shows that the persecutor falsely attributed an opinion to him, and then persecuted him because of that mistaken belief about his views.").

To establish eligibility for withholding of removal under the INA, an applicant must establish that his "life or freedom would be threatened in that country because of [his] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). This requires the alien seeking withholding of removal to demonstrate that it is "more likely than not" that he will be persecuted or tortured upon returning to his home country. <u>Fahim v. United States Att'y Gen.</u>, 278 F.3d 1216, 1218 (11th Cir. 2002) (per curiam). Because "[t]his standard is more stringent than the 'well-founded fear of

11

future persecution' required for asylum," Tan, 446 F.3d at 1375, an applicant who fails to establish eligibility for asylum likewise fails to establish eligibility for withholding of removal.

On appeal, Varon and Alvarez argue that the BIA erred in denying their applications for asylum and withholding of removal, alleging that the 1996 detention, the 1999 Molotov cocktail bombing, the November 2000 kidnaping, and the threatening phone calls in 2001, viewed cumulatively, establish past persecution. The government responds that Varon failed to demonstrate that he was targeted on account of his political opinion and, further, that the incidents in Varon's claim were isolated and indiscriminate and did not rise to the level of persecution. We agree.

We first note that while the 1996 detention and the 2001 telephone threats were on account of Varon's political opinion, it is less clear whether the 1999 Molotov cocktail incident and the 2002 detention in the forest likewise were motivated by Varon's actual or imputed political opinion.[7] With respect to the bombing, Varon merely speculates that the bomb was thrown at him by a member

---

[7] The BIA in this case made no finding regarding whether the mistreatment Varon suffered was "on account of" his political opinion, and instead denied relief after concluding that the mistreatment did not amount to persecution. Because we agree that there was no persecution, it is unnecessary to remand for a determination of whether the mistreatment was or was not politically motivated. Cf. Mejia v. United States Att'y Gen., 498 F.3d 1253, 1258 (11th Cir. 2007) (finding persecution and remanding for a determination of whether the persecution was on account of petitioner's political opinion in the first instance).

12

of the FER and concedes that he was unable to identify who threw the bomb. Accordingly, the record does not compel the conclusion that the bombing was connected to his political activity. See Silva v. United States Att'y Gen., 448 F.3d 1229, 1238 (11th Cir. 2006) (holding that where petitioner testified she did not know who fired shots at her car or why, the evidence did not compel the conclusion that the shooting was based on her political opinion).

As to the kidnaping in 2000, Varon's testimony strongly indicates that he and his group were stopped by the FARC not on account of any actual or imputed political opinion, but because they had invaded FARC-controlled territory and refused to pay the tax after being ordered to do so. The kidnaping thus appears to have been an isolated incident unrelated to Varon's 1996 political activities. Even assuming a nexus between Varon's political opinion and the incidents of mistreatment alleged, however, we do not find that the record compels a conclusion that these events, whether viewed separately or cumulatively, were severe and pervasive enough to constitute persecution.

Although the INA does not expressly define "persecution" for purposes of qualifying as a "refugee," we have repeatedly stated that "persecution is an extreme concept, requiring more than a few isolated incidents of verbal harassment or intimidation, and that mere harassment does not amount to persecution." Sepulveda, 401 F.3d at 1231 (quotations and citation omitted); see also Nelson v.

13

INS, 232 F.3d 258, 263 (1st Cir. 2000) (holding that persecution "must rise above unpleasantness, harassment, and even basic suffering"). In determining whether an alien has established past persecution, we must consider the cumulative impact of the persecutory incidents alleged. See Ruiz v. United States Att'y Gen., 479 F.3d 762, 766 (11th Cir. 2007).

While it is an "extreme concept," we have found persecution in a number of cases. For example, in Ruiz, we held that the record compelled a finding of past persecution where the petitioner received threatening phone calls, was beaten on two separate occasions, and was kidnaped for eighteen days by the FARC, during which time he also suffered severe beatings. Id. at 763-64, 766. Similarly, in Mejia, we found persecution where the petitioner was the target of attempted attacks over an eighteen month period, received multiple death threats, and was physically attacked twice, once when a large rock was thrown at him and once when members of the FARC broke his nose with the butt of a rifle. 498 F.3d at 1257-58; see also De Santamaria v. United States Att'y Gen., 525 F.3d 999, 1008-10 (11th Cir. 2008) (finding persecution where alien received numerous death threats, was dragged by her hair out of her vehicle, and was later kidnaped and beaten); Delgado v. United States Att'y Gen., 487 F.3d 855, 859-61 (11th Cir. 2007) (per curiam) (finding persecution based on cumulative effect of two beatings, continued threatening phone calls, and two instances of the alien's car

14

being vandalized with political graffiti); Niftaliev v. United States Att'y Gen., 504 F.3d 1211 (11th Cir. 2007) (finding that the cumulative effect of numerous beatings, arrests, searches, and interrogations, culminating in a fifteen-day, food-deprived detention compelled a finding of past persecution).[8]

Notwithstanding the foregoing, "[n]ot all exceptional treatment is persecution." Gonzalez v. Reno, 212 F.3d 1338, 1355 (11th Cir. 2000). For example, in Zheng v. United States Att'y Gen., 451 F.3d 1287 (11th Cir. 2006) (per curiam), we held that the petitioner, who was dragged by his arms to a detention yard, detained for five days, forced to watch reeducation videos, to stand in the sun for two hours, and to sign a pledge not to practice his religion, failed to establish past persecution. Id. at 1289-92. Because Zheng had presented no evidence that he was physically injured, we concluded that the "five-day detention during which he was not harmed [did] not *compel* the conclusion that he experienced past persecution." Id. at 1290; see also Djonda v. United States Att'y Gen., 514 F.3d 1168, 1174 (11th Cir. 2008) (holding that a minor beating, even in conjunction with threats, did not compel a finding of persecution); see also Tawm v. Ashcroft, 363 F.3d 740, 742-43 (8th Cir. 2004) (holding that two beatings,

---

[8] While these cases all involved the infliction of substantial physical harm, we have rejected a rigid requirement of physical injury. Sanchez-Jiminez v. United States Att'y Gen., 492 F.3d 1223, 1233 (11th Cir. 2007). Instead, we have held that serious physical injury is not required for a finding of persecution "where the petitioner demonstrates repeated threats combined with other forms of severe mistreatment." De Santamaria, 525 F.3d at 1009.

15

which were four years apart, lasted only a few hours each, and did not result in serious injury, did not constitute persecution); Dandan v. Ashcroft, 339 F.3d 567, 573-74 (7th Cir. 2003) (finding no persecution where petitioner was detained, beaten, and deprived of food for three days); Prasad v. INS, 47 F.3d 336, 339 (9th Cir. 1995) (finding no persecution where petitioner was detained for several hours, hit in the stomach, and kicked from behind); Mendez-Efrain v. INS, 813 F.2d 279, 282-83 (9th Cir. 1987) (finding no persecution where petitioner was detained and interrogated for four days).

In this case, Varon suffered a one-day detention in 1996 and a thirty-six hour kidnaping in 2000, the cumulative duration of which was approximately half of the duration of the five-day kidnaping in Zheng. He suffered no physical harm as a result of either detention, and admitted that he received only "minor injuries" as a result of the Molotov cocktail incident. Cf. Ruiz, 479 F.3d at 766 (finding persecution where petitioner presented medical records documenting the injuries he suffered during his kidnaping). We cannot say that these three isolated incidents, occurring over the course of several years and involving no more than minor injuries, constitute the kind of mistreatment that would compel a reasonable factfinder to make a decision contrary to that made by the BIA in this case. See Sepulveda, 401 F.3d at 1231.

16

We also conclude that substantial evidence supports the BIA's finding that Varon does not have an objectively reasonable fear of future persecution because he has failed to present any evidence showing that he will be targeted if he returns to Colombia.[9] We note that although the evidence may not exclude the possibility that Varon was persecuted in the past or will be persecuted upon his return to Colombia on account of a protected ground, our inquiry is not whether the evidence presented *might* support a claim for relief, but rather, whether the record *compels* a reversal of the finding to the contrary. See Silva, 448 F.3d at 1237. Here, it does not.

## III. CONCLUSION

Varon seeks review of the BIA's denial of asylum and withholding of removal. Because the evidence does not compel a finding that Varon suffered past persecution or has a well-founded fear of future persecution on account of his political opinion or any other protected ground, we DENY the petition.

**PETITION DENIED.**

---

[9] Because Varon cannot meet the "well-founded fear" standard for asylum, he cannot meet the more stringent standard for establishing eligibility for withholding of removal. See Mazariegos v. United States Att'y Gen., 241 F.3d 1320, 1324 n.2 (11th Cir. 2001) (noting that an applicant who is unable to meet the "well-founded fear" standard for asylum is generally precluded from qualifying for withholding of removal).