In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 05-3231

VALI AND DHURATA BOCI,

*Petitioners,*

*v.*

ALBERTO R. GONZALES,

*Respondent.*

---

On Petition for Review of an Order
of the Board of Immigration Appeals.
Case Nos. A-79-437-236, A-79-437-241

---

ARGUED NOVEMBER 28, 2006—DECIDED JANUARY 12, 2007

---

Before FLAUM, MANION, and WILLIAMS, *Circuit Judges.*

FLAUM, *Circuit Judge.* On March 4, 2002, Vali and Dhurata Boci, a married couple from Albania, arrived in the United States, presented fraudulent travel documents, and were detained by the Department of Homeland Security ("DHS"). After DHS commenced removal proceedings, the Bocis sought asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). On June 25, 2004, the immigration judge ("IJ") denied the Bocis' requests, holding that they had demonstrated neither past persecution nor a well-founded fear of future persecution. The Board of Immigration Appeals ("BIA") affirmed the IJ's decision, and the Bocis now

petition this Court for review. For the following reasons, we deny the Bocis' petition.

## I. BACKGROUND

Vali Boci was born on August 7, 1973 in Lazarat in the southern part of Albania. On March 25, 2001, he married Dhurata. Historically, Vali's family associated with the Democratic Party, and, in 1970, during the Communist Regime, Vali's uncle Ali fled Albania for the United States. Upon the Ali's flight, the Communist government targeted the Boci family. From 1979 to 1981, the government detained Vali's father, Nesim Boci, and prevented his cousins from attending school. In 1990, the Communist regime fell, and the 1992 elections brought the Democratic Party into power. Two of Vali's uncles, Bujar and Zagoll Mele, worked as police officers while the Democratic Party was in control. In 1991, Vali's father-in-law, who previously was involved in the Communist Party, joined the Democratic Party. On January 25, 1993, Vali became a member of the Democratic Party.

In late 1996 and early 1997, Albania was in chaos following the collapse of the pyramid schemes.[1] Amid the chaos, the Socialist Party gained power and subsequently targeted Vali's family as Democratic Party supporters. The Socialist Party promptly fired Vali's two

---

[1] During this time period, several large financial pyramid schemes dominated the country. *See* Christopher Jarvis, *The Rise and Fall of Albania's Pyramid Schemes,* 37 FINANCE & DEVELOPMENT, (March 2000) *available at* http://www.imf.org/ external/ pubs/ft/fandd/2000/03/jarvis.htm. Many Albanians— about two-thirds of the population—invested in them. *Id.* When the schemes collapsed, there was uncontained rioting, the government fell, and the country descended into anarchy and a near civil war in which some 2,000 people were killed. *Id.*

uncles, who had been police officers for more than five years. Then, on February 6, 1998, someone placed an explosive near Dhurata's house, destroying the right side of it. Vali believes the purpose of this explosion was to kill his wife's family, but, fortunately, the blast only injured Dhurata's family members. Although Dhurata's father reported the explosion to the police, they never charged or arrested anyone for the offense. The police came to the scene of the accident, but they did not take any photographs or ask any questions. Later that same year, on September 12, someone burned down Dhurata's father's warehouse.

In October 2001, during local elections, Vali acted as an observer at a polling station, where he witnessed and took notes of numerous irregularities. When the police learned of his activities, they took him outside, asked to see his notes, and threatened to detain him if he made the notes public. Despite the officers' threats, Vali later gave his notes to the proper authorities. Although observers from other political parties also took notes during the election, the police did not detain or question them.

In early 2002, Vali decided to flee Albania after an unknown person murdered his cousin, who was also a Democratic Party member. On March 4, 2002, fearing for their lives, Vali and Dhurata used Italian passports to travel to the United States. Vali testified that he believed he would be placed in jail or killed if he returned to Albania. Presently, with the exception of his sister living in Italy and his uncle living in the United States, Vali's family, including his parents, siblings, aunts, and uncles, live in Albania. Dhurata's parents also remain in Albania.

Dhurata Boci corroborated her husband's testimony, with some additional information. Dhurata stated that

she was twenty years old and was not a member of any Albanian political party, although her husband and father were both members of the Democratic Party. Her father participated in Democratic meetings and rallies, but Dhurata did not attend any of those meetings. She did, however, discuss the meetings with her father. According to Dhurata, the Socialist Party feared that her father would disclose former acts of the Communist Party to the Democratic Party. She also believed that Socialists perpetrated the explosion at her home on February 6, 1998 because of her father's Democratic Party member-ship. Although she was present on the night in question, she did not see who placed the explosives near the house.

Dhurata testified that beginning in 1998, individuals threatened and harassed her on the way to school.[2] They told Dhurata that if her father did not change his way and join the Socialist Party, she would be killed. She received these threats until she left Albania. Dhurata stated that she feared returning to Albania because she believed members of the Socialist Party would kill her.

Throughout the hearing, the IJ repeatedly questioned the Bocis. At several different times, the IJ expressed impatience and asked the Bocis' attorney to move things along. He cut off a line of questioning about the Boci family's political history, noting that its relevance and probative value were weak and that time was limited. At least two different times, the IJ criticized the Boci's Albanian-speaking attorney for challenging the transla-tion of questions, stating, "The attorney for the respondent is not interpreting. He cannot have two roles. He can't act as interpreter and as advocate." Transcript of Im-migration Hearing at 64, *Boci v. Gonzales*, Nos. A-79-437-

---

[2] Dhurata's husband and family later identified the harassing individuals as members of the Socialist party.

236 and A-79-437-241 (Feb. 3, 2004) (hereinafter "Tr.").
The IJ also expressed impatience with Vali Boci when he
offered extra information, did not give a direct answer to
a question on cross examination, or began speaking be-
fore the government's lawyer finished a question.[3]

At one point in the hearing, the Bocis' attorney re-
marked, "with all due respect, Your Honor, the the [sic]
attitude that's coming across at this point is very con-
frontational." Tr. at 52. After disagreeing with the attor-
ney's assessment, the IJ added, "Counsel, counsel, counsel,
listen to me. We only have so much time. It's now approxi-
mately [10:40]. All right. We started the case at 9:30. All
right? All right. We only have so much time." *Id.*

The Bocis petition this Court for review, claiming that
the IJ and BIA erred in finding that they were ineligible
for relief and alleging that they were denied due process
of law.

## II. DISCUSSION

Where, as here, the BIA summarily adopts the IJ's
decision, this Court reviews the IJ's factual findings and

---

[3] The following exchange is representative of the IJ's tempera-
ment at various moments throughout the hearing:

**IJ:** Don't give us extraneous material. Just answer his
question. All right?

**Vali Boci:** I'm trying to answer to the best of my knowledge.

**IJ:** Sir, you're being repetitive on your answers. All right.
We've heard your story, we know your story now. You don't
have to repeat it each time when you give an answer to the
question. We don't want the background information
anymore. You've said it repetitively here. We have the
message. All right? All right. So listen to the question and
answer the question.

Tr. at 101.

reasoning as though they were the Board's. *Mousa v. INS*, 223 F.3d 425, 428 (7th Cir. 2000). We must uphold the BIA's denial of relief so long as it is "supported by reasonable, substantial and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (internal quotation and citation omitted). Reversal is appropriate only if the record compels granting the applicant asylum. *Id.* Asylum is available to persons who have suffered past persecution or have a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1101(a)(42)(A); *Feto v. Gonzales*, 433 F.3d 907, 911 (7th Cir. 2006). Here, the Bocis point to their membership in and association with the Democratic Party as well as their membership in the social groups comprised of their respective families.

An applicant who successfully proves past persecution is presumed to have a well-founded fear of future persecution, but the government can rebut that presumption by showing a change in conditions in an applicant's homeland. *See, e.g.*, *Gjerazi v. Gonzales*, 435 F.3d 800, 808 (7th Cir. 2006). Alternatively, an applicant demonstrates a well-founded fear of future persecution if his or her fear is both subjectively genuine and objectively reasonable in light of credible evidence. *Id.*

We have defined persecution as "punishment or the infliction of harm for political, religious, or other reasons that this country does not recognize as legitimate." *Dandan v. Ashcroft*, 339 F.3d 567, 573 (7th Cir. 2003) (citations and quotations omitted). Although the term includes "actions less severe than threats to life or freedom, actions must rise above the level of mere harassment to constitute persecution." *Id.* In fact, we have noted that in order to be an act of persecution, the behavior in question "must threaten death, imprisonment, or the

infliction of substantial harm or suffering." *Sharif v. INS*, 87 F.3d 932, 935 (7th Cir. 1996).

### A. Past Persecution or Well-Founded Fear of Future Persecution

Petitioners seeking to establish past persecution must satisfy a heavy evidentiary burden. Indeed, our standard on review is "difficult to meet without powerful and moving evidence." *Dandan*, 339 F.3d at 573-74. A survey of analogous cases demonstrates that the Bocis have not met this exacting standard because their evidence does not compel a finding of past persecution.

In *Cecaj v. Gonzales*, we vacated the removal order of an Albanian Democrat, noting numerous circumstances indicative of past persecution. 440 F.3d 897 (7th Cir. 2006). In that case, the petitioner was detained for six days and beaten by masked police so badly that he required hospitalization. *Id.* at 898. Soon after, a member of the Socialist Party fired a gun near his head. *Id.* He received threatening phone calls regularly and suffered a second arrest and beating by the police during his campaign for public office, allegedly for not having proper identification papers. *Id.* Finally, his ten-year-old brother was kidnapped by persons who told the child that the crime was motivated by the petitioner's political activity. *Id.*

By contrast, in *Hasanaj v. Ashcroft*, we affirmed the BIA's denial of asylum where a gang of Socialists threatened an Albanian Democratic Party member at gunpoint and set his car on fire, but did not physically harm him. 385 F.3d 780, 782 (7th Cir. 2004). We affirmed the BIA's conclusion that the petitioner's claims did not rise to the level of persecution, emphasizing that the petitioner was an average party member in a broad-based Democratic movement. *Id.* Moreover, we reasoned, the petitioner's

encounter with the gang could be attributed to widespread lawlessness in the country at the time, rather than his being singled out for his political beliefs. *Id.* at 782-83.

Petitioners direct us to *Asani v. INS*, 154 F.3d 719, 722-23 (7th Cir. 1998), in which we reversed the BIA's denial of asylum where the police detained the petitioner for two weeks, knocked out two of his teeth, and deprived him of food.

Unlike the petitioners in *Cecaj* and *Asani,* the Bocis have not demonstrated physical harm or abuse. As this Circuit recognized in *Diallo v. Ashcroft*, 381 F.3d 687, 698 (7th Cir. 2004), "short detentions or detentions without physical abuse seem to have been less apt to reach the 'persecution' threshold required by this court." Vali was temporarily detained once and released without injury. Although someone killed his cousin, Vali had no way of knowing if the murder was politically motivated. Similarly, while Socialists and Communists historically harassed Vali's family because of their political involvement, Vali was not the subject of the harassment.

Likewise, even though Dhurata's family's home and warehouse were both burned down, she did not know who committed these crimes. As a result, she could only speculate that they were politically motivated rather than a result of widespread lawlessness at the time. Although Socialist Party members harassed Dhurata over a period of years, they never harmed her. Moreover, most of the Bocis' family members (the very ones who were allegedly victimized) remain in Albania. We therefore hold that the Bocis' evidence does not compel a finding of past persecution and accordingly affirm the BIA's finding.

Nor have the Bocis demonstrated a well-founded fear of future persecution. Even assuming that the Bocis have a subjectively genuine fear of future persecution, their fear is not objectively reasonable. *See Sayaxing v. INS*, 179

F.3d 515, 519-20 (7th Cir. 1999). Although the Bocis need not establish "certain persecution" or even that persecution is "highly probable" should they return to Albania, they must show that it is a "reasonable possibility." *Gjerazi*, 435 F.3d at 808 (citing *INS v. Cardoza-Fonseca*, 480 U.S. 421, 430-32 (1987)). Given that the Bocis have not established past persecution and their families have remained in Albania without further incident, we decline to reverse the BIA's finding that the Bocis did not establish a well-founded fear of future persecution.

### B. Withholding of Removal and Relief under CAT

In the alternative, the Bocis seek withholding of removal and relief under CAT. To qualify for withholding of removal, an alien bears the burden of proof and "must demonstrate a 'clear probability' that he or she will face persecution in the country to which he or she will be removed." *Firmansjah v. Gonzales*, 424 F.3d 598, 605 (7th Cir. 2005) (citation omitted). The clear probability standard is "a more stringent test than the standard for establishing eligibility for asylum," *id.,* and since the Bocis have not satisfied the less stringent asylum standard, they do not qualify for withholding of removal.

Finally, the Bocis seek protection under CAT. We review the BIA's denial of relief on this ground under the substantial evidence standard, once again asking whether "the record compels a contrary result." *Mabasa v. Gonzales*, 455 F.3d at 744 (7th Cir. 2006) (internal quotation and citations omitted). To obtain relief under CAT, the Bocis must show that "it is more likely than not that if removed to [Albania, they] will be subject to torture." *Boyanivskyy v. Gonzales,* 450 F.3d 286, 292 n.3 (7th Cir. 2006) (citing 8 C.F.R. § 208.16(c)(2)). Federal regulations define torture as:

> [A]ny act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 208.18(a)(1). Because the Bocis have provided little, if any, evidence of torture as defined by federal regulations, the record does not compel granting them relief under CAT.

## C. Denial of Due Process

The Bocis next argue that the IJ denied them a reasonable opportunity to present their claims for asylum. We review this due process challenge de novo, because the question of whether an immigration hearing violates due process is a purely legal one. *Kerciku v. INS*, 314 F.3d 913, 917 (7th Cir. 2003).

Under 8 C.F.R. § 1229a(b)(4)(B), an alien in any immigration proceeding is entitled to, among other things, a reasonable opportunity to examine and object to the evidence against him or her, to present evidence on his or her own behalf, and to cross-examine witnesses presented by the government. We have said that "[i]n the context of political asylum, due process requires, among other things, that an applicant receive 'a meaningful opportunity to be heard.'" *Kerciku*, 314 F.3d at 917 (citing *Nazarova v. INS,* 171 F.3d 478, 482 (7th Cir. 1999)). To

receive a new hearing, a petitioner must demonstrate a denial of due process as well as resulting prejudice. *See Capric v. Ashcroft*, 355 F.3d 1075, 1087 (7th Cir. 2004). Prejudice occurs when the due process transgression is "likely to impact the results of the proceedings." *Id.* at 1087-88.

The Bocis contend that the IJ's confrontational attitude, routine interruptions, and incessant questioning denied them due process. We disagree. An IJ's large docket makes his time a limited resource, so he must strive to provide fair procedures while efficiently managing his docket. In this case, the IJ's insistence on moving things along did not deny the Bocis a meaningful opportunity to be heard because they were still able to develop a significant record. Nor did the IJ's questioning violate due process. During an asylum hearing, "[a]n immigration judge is permitted to interrogate, examine, and cross-examine the alien and any witnesses." *See Diallo*, 381 F.3d at 701 (citing 8 U.S.C. § 1229a(b)(1)). Unlike an Article III judge, an immigration judge is not merely the fact-finder and adjudicator; he also has an obligation to establish the record. *Hasanaj*, 385 F.3d at 783. Questioning by the IJ may cross the line, however, when it "becomes so aggressive that it frazzles applicants and nitpicks inconsistencies," thus distorting the record. *Giday v. Gonzales*, 434 F.3d 543, 549 (7th Cir. 2006). Here, the IJ's questioning, although extensive at times, was not so aggressive as to distort the record.

To support their due process claim, the Bocis point to *Podio v. INS*, in which we found a due process violation where the IJ interrupted testimony, overtook questioning, and excluded important testimony. 153 F.3d 506, 509-510 (7th Cir. 1998). *Podio* is inapplicable, however, because even assuming that the IJ conducted an inappropriate examination, the Bocis have not established prejudice.

The Bocis identify three ways in which the alleged denial prejudiced them: 1) the IJ's behavior prevented them from fully developing the significance of Dhurata's father's switch from the Communist to the Democratic Party; the IJ cut off an important line of questioning about the persecution of Vali's family under a previous regime; and the IJ intimidated them so that they could not express themselves fully during the hearing.[4] Despite their claims of prejudice, the Bocis do not specifically identify additional testimony that they would have offered

---

[4] At oral argument, the Bocis' attorney emphasized one exchange between Vali and the IJ about livestock, arguing that the IJ's preoccupation with pigs deprived the Bocis of the opportunity to make their case by wasting precious time. The following exchange occurred as Vali testified about his father:

Q. What did he do before retiring?

A. He was doing—he was taking care of the livestock that we had, livestock—

Q. Livestock—

A.—that we had and like most of the families in the village do around the—the work around the house.

Q. And livestock, are we talking about lambs? What are we talking about? Pigs? What?

A. We had a few cows and also we had a few calves—cows.

. . .

Q. Cows. And what else?

. . .

Q. No pigs, huh?

A. No.

Q. No chickens?

A. Yes. A lot of chickens.

Tr. at 30-31. Not only is the exchange quite brief, it was relevant to Vali's family's socioeconomic status in Albania.

to develop a more complete record. In fact, they were able to testify at length about Dhurata's father's affiliations with the Communist and Democratic Parties. Moreover, any excluded testimony about Vali's family history was neither relevant nor probative to their asylum claim because it related to events that happened many years prior to the hearing. In short, further elaboration on these issues would not have changed the outcome of the case. *See Ciorba v. Ashcroft*, 323 F.3d 539, 544-45 (7th Cir. 2003) (finding no prejudice where IJ prevented further testimony focused on the mistreatment of petitioner's extended family because it would not have assisted petitioner in establishing her eligibility for asylum). We must therefore deny the Bocis' petition for review.

### III.  CONCLUSION

For the foregoing reasons, we AFFIRM the decision of the BIA and DENY the petition for review.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*