NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois  60604**

Argued August 7, 2007
Decided September 10, 2007

**Before**

Hon. William J. Bauer, *Circuit Judge*

Hon. Michael S. Kanne, *Circuit Judge*

Hon. Ilana Diamond Rovner, *Circuit Judge*

No. 06-3669

| | | |
|---|---|---|
| Arta Emini,<br>*Petitioner*, | | Petition for Review of an Order<br>of the Board of Immigration Appeals |
| *v.* | | No. A95-574-815 |
| Alberto R. Gonzales,<br>*Respondent*. | | |

**O R D E R**

Arta Emini, a native Albanian, petitions for review of an order of the Board of Immigration Appeals affirming the denial of her application for asylum, withholding of removal, and protection under the Convention Against Torture. Because substantial evidence does not compel a finding that Emini suffered persecution or that she has a well-founded fear of future persecution, we deny Emini's petition for review.

## I. Background

In support of her application for asylum, Emini testified at a hearing before the Immigration Judge ("IJ") to incidents of interrogation and physical abuse at the hands

of the police and threats from university faculty arising from her involvement in the Albanian Democratic Party, which was the leading opposition party in Albania. The IJ found that Emini testified credibly to these incidents but denied her application for asylum and withholding of removal because the incidents did not amount to past persecution and she had failed to demonstrate a well-founded fear of future persecution.

Emini testified at the hearing to the following events. She became involved in Albanian politics in 1996 when she joined the Youth Forum of the Democratic Party of Albania. Emini also had associations with the Democratic Party through her father, who had been a member since the early 1990's and who had held the position of party secretary in the village of Bulgarec. Because of her father's affiliation with the Democratic Party and because her birthplace was in Bulgarec, Emini was appointed to the position of election observer to oversee the June 1997 polls in Bulgarec. The Socialist Party won the June 1997 election, however, remaining in power through the time that Emini fled from Albania to the United States in August 2001.

Emini entered college to pursue a nursing degree in 1997 and became a student organizer for the Youth Forum. It was here that she first experienced problems because of her political affiliation. Emini's professors, who were sympathizers of the Socialist Party, advised her to give up her political activities and to focus her attention on her studies. In May 1998, the Vice Dean of the college threatened that he would prevent Emini from graduating and have her arrested if she continued her political involvement. Despite this threat, Emini graduated with a degree in nursing in 2001. She was unsuccessful in her attempts to find a nursing job following graduation, however, because the Socialist Party controlled the hospitals and would not hire members of the Democratic Party.

While attending the university, Emini's involvement with the Youth Forum also came to the attention of the police. She and several friends were arrested and interrogated by the police and Albanian state intelligence service in September of 1998 because of their participation in a silent protest in memory of Azem Hajdari, the assassinated leader of the Democratic Party. During the interrogation, the police told Emini and her friends that they knew that they had organized the protest and that they would go to jail for doing so. The police then separated Emini and her friends, taking them to different rooms and questioning them for approximately half an hour. One officer forced Emini against a wall, hurting her left shoulder and the right side of her head. The officer used profanity and threatened her, trying to scare Emini into quitting her political activities. Emini and her friends were not imprisoned that day.

A year later, in September 1999, Emini went to the police station accompanied by her father in response to a summons requesting that she appear to clarify her political

involvement.  When she arrived, she was taken to a room where she was questioned for three hours by two men in civilian clothing about student plans and demonstrations to commemorate Hajdari's assassination.  During the questioning, the officers slapped Emini so hard that her nose bled and dragged her by hair.  The officers also hit and bruised her legs with rubber sticks, threatened her life and the lives of her family members, and threatened to sell her into prostitution if she did not provide the information that they sought.  After she was released, Emini did not seek medical attention for her injuries.

The following September, as local elections neared, Emini and several of her friends were returning from a campaign rally sponsored by the Democratic Party in another village when they were stopped by six police officers.  The officers questioned them about where they had been and what they were doing.  The officers threatened Emini and her friends, telling them that they would "get it in the neck" if they continued their political activities.  The officers hit Emini in the face and dragged her by her hair.  Her male friends were punched in the face.  The officers detained the group for an hour and then released them.

Emini was unable to vote in the local elections that September because her name, along with the names of her family members, had been left off of the list of registered voters.  Emini believed that this was a tactic used by the Socialist Party to prevent members of the Democratic Party from voting in the election.

In October 2000, Emini was returning home from a protest challenging the Socialist Party's alleged manipulation of the election results when she was forced into a car with individuals who appeared to be agents of the secret service.  She was taken to the police station where she was placed in a room, punched in the face, and detained for three days.  A family friend and doctor later treated Emini's injuries at her home, and she took time off from school to recover.

Emini's name was included on the list of registered voters by the time of the Parliamentary elections in June of 2001.  She continued to participate in protests following this election.  At a demonstration on July 15, 2001, Emini saw police openly beat protesters, place them in police cars, and arrest them.  An agent of the secret service apprehended her, but her friends were able to extract her from his grip.

Following this incident, Emini stayed with friends because she feared that the police would come to her home.  Two warrants for her arrest were sent to her home during this period.  Emini did not report to the police station because she feared further harm at the hands of the police.  Emini did not present the warrants to the IJ at the hearing because her father had torn them up and thrown them away.  On

August 20, 2001, shortly after her parents received the warrants, Emini left Albania; she arrived in the United States on August 25, 2001.

## II. Analysis

Where, as here, the BIA affirms the IJ's decision without an opinion, we review the IJ's analysis directly. *Moreno-Cebrero v. Gonzales*, 485 F.3d 395, 398 (7th Cir. 2007). We review the IJ's decision under the deferential "substantial evidence" standard: "we require only that the decision be supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Gjerazi v. Gonzales*, 435 F.3d 800, 807 (7th Cir. 2006) (citation and internal quotation omitted). "It is irrelevant whether or not this court would have reached the same conclusion if in the IJ's position." *Bejko v. Gonzales*, 468 F.3d 482, 485 (7th Cir. 2006). We will reverse only if the evidence compels a different result. *Boci v. Gonzales*, 473 F.3d 762, 766 (7th Cir. 2007).

Asylum may be granted "to aliens who apply for asylum in a timely fashion, meet certain procedural requirements, and qualify as refugees." *Sosnovskaia v. Gonzales*, 421 F.3d 589, 593 (7th Cir. 2005) (*citing* 8 U.S.C. § 1158(b)(1)(A)). A "refugee" is "a person who is unable or unwilling to return to the country of her nationality because of 'persecution or a well-founded fear of future persecution on account or race, religion, nationality, membership in a particular social group, or political opinion. . . .'" *Id.* (*quoting* 8 U.S.C. § 1101(a)(42)(A)). The asylum applicant bears the burden of proving by a preponderance of the evidence that she qualifies as a refugee according to this definition. *Id.* (*citing* 8 C.F.R. § 208.13(a)). If the applicant establishes that she suffered past persecution, she is presumed to have a well-founded fear of future persecution. *Id.* (*citing* 8 C.F.R. § 208.13(b)(1)).

On appeal, Emini challenges the IJ's denial of her petition for asylum based on political persecution. This Court has explained that persecution "must rise above the level of harassment." *Prela v. Ashcroft*, 394 F.3d 515, 518 (7th Cir. 2005). The acts in question must go beyond merely being unfair, unjust, or unlawful. *Margos v. Gonzales*, 443 F.3d 593, 596 (7th Cir. 2006). They instead must threaten death, imprisonment, or substantial harm or suffering. *Boci*, 473 F.3d at 766 (*citing Sharif v. INS*, 87 F.3d 932, 935 (7th Cir. 1996)). Persecution also "must result from more than unpleasant or even dangerous conditions in [the] home country." *Nakibuka v. Gonzales*, 421 F.3d 473, 476 (7th Cir. 2005) (citation omitted). "Past persecution may be shown through even a single episode of detention or physical abuse, if it severe enough." *Id.* (citations omitted). And it "may include detention, arrest, interrogation, prosecution, illegal searches, confiscation of property, surveillance, beatings, [ ] torture, behavior that threatens the same, and non-life-threatening behavior such as torture and economic deprivation if the resulting conditions are sufficiently severe." *Gjerazi*, 435 F.3d at 808 (internal quotations and citation omitted).

Emini based her claim of persecution on the following incidents: (1) the threat from the university's dean; (2) the September 1998 arrest and interrogation, during which an officer hurt Emini's left shoulder and the right side of her head; (3) in September 1999, the interrogation and 20-hour detainment at the police station, during which an officer slapped her, causing her nose to bleed, and grabbed her by her hair; (4) in September 2000, the police stopped Emini and her friends, detained them for an hour, hit Emini in the face and dragged her by her hair, and told her that she and her friends would "get it in the neck" if they continued their political activities; and (5) in October 2000, the police detained Emini for three days at the police station, punching her in the face and pulling her hair when she refused to cooperate. Considering these incidents in the aggregate, it is possible to find that Emini suffered past persecution. The IJ, however, found that these incidents were not so severe as to constitute persecution. The record does not compel a contrary finding.

This Court has examined a broad spectrum of asylum cases in which the applicant claims past persecution based, in part, on detentions. *See Diallo v. Ashcroft*, 381 F.3d 687, 698 (7th Cir. 2004) (recognizing that "short detentions or detentions without physical abuse seem to have been less apt to reach the 'persecution' threshold required by this court"). On prior occasions, we have denied petitions for review where the asylum applicant claimed past persecution arising from being detained, beaten, and deprived of food for three days, *see Dandan v. Ashcroft*, 339 F.3d 567, 574 (7th Cir. 2003); from having a van stolen with gun shots fired in the vicinity of the applicant's yard, being questioned at a police station and a fine imposed the following day, being confined at a police station for two weeks, and having his home and family threatened, *see Bejko*, 468 F.3d at 485-86; and from being interrogated on several occasions, arrested, detained once for thirty-six hours, and having his home searched and property confiscated but never being beaten, tortured, or forced to perform hard labor, *see Zalega v. INS*, 916 F.2d 1257, 1260 (7th Cir. 1990). Because she suffered physical abuse, as well as arrests, interrogations, and threats, Emini's claim of past persecution may be deemed more serious than those asserted in the above-cited cases.

At the same time, the physical abuse, coupled with the detentions and interrogations, that Emini experienced does not rise to the level of severity suffered by the petitioner in *Asani v. INS*, 154 F.3d 719, 721 (7th Cir. 1998). In *Asani*, this Court found it likely that the detentions at issue were sufficiently serious as to constitute past persecution where the petitioner was detained in a jail cell for two weeks with no room to sit, deprived of food and water, and repeatedly interrogated. *Id.* at 724. He was later detained again and beaten with fists and a police stick, during which two teeth were knocked out. *Id.* Likewise, in *Vaduva v. INS,* 131 F.3d 689, 690 (7th Cir. 1997), this court agreed with the BIA's finding of past persecution where, in a single beating, the petitioner was punched, his face bruised, and his finger broken.

While this is hardly an exhaustive review of this Court's consideration of claims of past persecution involving detentions, it suffices to show that the detentions and physical abuse that Emini experienced, while serious, do not compel a finding of past persecution.[1] Unlike the petitioner in *Asani* or *Vaduva,* Emini did not offer specific information about the degree of her injuries that would allow us to assess the severity of the acts. *See, e.g., Dandan*, 339 F.3d at 574 ("A standard of review that requires our being *compelled* to reach a conclusion contrary to the BIA means that we necessarily search for specifics, not generalities.") (emphasis in original). While this Court has expressed its distaste with being tasked with quantifying suffering for purposes of determining asylum eligibility, *see id.*, it is our responsibility. Here, Emini's detentions and physical abuse are not of such a greater degree than those at issue in *Dandan,* for example, that we are compelled to find that she was subject to past persecution.

We note that this conclusion comes with reservation. The context of Emini's harms shows that she suffered physical abuse, detentions, and threats because of her support of the Democratic Party. The detentions were systematic: they occurred at times of increased political activism during which the police targeted Emini because of her efforts for the Democratic Party as a means of quelling popular support. Additionally, her detentions and physical abuse were repetitive and their length and the associated violence increased over time. This increase in severity was accompanied by threats on her life and the lives of her family members, threats of imprisonment, and threats of forced prostitution. At the time Emini fled Albania, the police were seeking her out, in line with their threats, by issuing two warrants. While these facts support a finding of persecution, they do not compel such a finding, and the law requires that such a finding be compelled before we grant a petition for review. *Boci*, 473 F.3d at 766.

Because Emini did not demonstrate past persecution, she is not entitled to a rebuttable presumption of future persecution. She may nevertheless establish "a well-founded fear of future persecution if [her] fear is subjectively genuine and objectively reasonable in light of credible evidence." *Gjerazi*, 435 F.3d at 808 (citations omitted).

As evidence of the objective component of her fear of future persecution, Emini offered testimony about the two arrest warrants that were sent to her parents' home. Since she had not seen the warrants, she did not know whether they required her arrest or requested her presence for questioning. She also offered a letter from her father, which states that two policemen showed up with a summons for Emini, which he tore up. The letter continued that Emini's father advised her against appearing at

---

[1] We do not suggest that it is necessary for the asylum applicant to have bones broken or teeth lost in order to establish the requisite severity of abuse for asylum purposes.

the Prosecutor's Office. A few days later, the police threatened that there would be consequence for her family if Emini failed to appear. The IJ found that this evidence, on its own, did not establish a reasonable possibility that she would face political persecution if she were to return to Albania because they established nothing more than that she was being sought for questioning.

Additionally, the IJ considered U.S. State Department country reports, which stated that the Democratic Party in Albania often has complained credibly about incidents of police harassment and the dismissal of some party members from their official positions because of political reasons. The IJ reasoned that these reports showed that Emini might expect to be questioned by authorities and may be subjected to harassment by the police because of her continued support of the Democratic Party if she returns to Albania. We agree with the IJ that these types of actions, questioning and harassment, do not suffice to create a reasonable possibility of persecution. Moreover, the IJ considered the fact that Emini's family has continued to live in Albania in relative comfort despite her father's involvement with the Democratic Party and despite the previous threats to her family in connection with Emini's failure to appear in response to the summonses. *See Boci*, 473 F.3d at 767. The IJ found that this factor likewise weighed against a finding of a reasonable possibility of future persecution if she were to return to Albania. We conclude that the evidence does not compel a conclusion contrary to the one reached by the IJ.

Because Emini failed to meet her burden of proof in establishing her eligibility for asylum, she cannot meet the more stringent requirement of a clear probability of persecution for withholding of removal. *Shymyhelskyy v. Gonzales*, 477 F.3d 474, 481 (7th Cir. 2007).

### III. Conclusion

For the foregoing reasons, the petition for review is DENIED.

ROVNER, *Circuit Judge,* DISSENTING.

I respectfully dissent. The IJ found Emini credible and found that her testimony was supported by corroborating documents, leaving only the question of whether the incidents she described amount to past persecution or support a well-founded fear of future persecution. As the majority notes, to constitute past persecution the acts in question must rise to a level above mere harassment: they must threaten death, imprisonment, or substantial harm or suffering beyond being merely unfair, unjust,

or unlawful. *Boci v. Gonzales*, 473 F.3d 762, 766 (7th Cir. 2007); *Margos v. Gonzales*, 443 F.3d 593, 596 (7th Cir. 2006); *Dandan v. Ashcroft*, 339 F.3d 567, 573-74 (7th Cir. 2003). Emini's evidence must be specific in its descriptions of the type of harms she suffered in order to prove that the treatment was severe enough to constitute persecution. *Dandan*, 339 F.3d at 573-74.

Here, the record more than adequately supports these requirements: Emini was imprisoned, she was credibly threatened with death, and she did suffer in a way that surpassed unfairness and entered the realm of political subjugation. She described all these events with sufficient clarity and specificity for the IJ to find that they happened just as she described them. The majority is willing to admit that the record indeed supports a determination of persecution; I believe it compels that result, requiring that this court grant Emini's petition, vacate the decision of the BIA, and remand for a new hearing in which Emini would be properly afforded a presumption of a well-founded fear of future persecution. *See Boci*, 473 F.3d at 766; *Bejko v. Gonzales*, 468 F.3d 482, 485 (7th Cir. 2006).

The pattern of harms suffered by Emini is key to understanding the seriousness of the situation she faced in Albania. When one couples the undisputed facts of her detentions and mistreatment (including several events of significant physical violence) with (1) the steadily escalating nature of the abuse, (2) the explicit threats that she should discontinue her political activity, and (3) the continuing official interest in her, as evidenced by the warrants delivered to her home just before she fled, the finding of political persecution is inescapable. The socialist Albanian authorities communicated a clear message (stop your opposition) and backed it up with detentions and mistreatment. The police, knowing of her organizational role among the student members of the Democratic Party, routinely and systematically sought her out, detained her, and abused her in an attempt to learn about upcoming party rallies and events so that they could quell broader political expression. Through both explicit threats of more serious reprisals and an escalating pattern of abuse, they warned her that if she did not stop, she would suffer worse treatment than she already had. This worsening trend was apparent in the years before she fled: in 1998 she was detained for a half hour and pushed against a wall; in 1999 she was detained for 20 hours, dragged by her hair, slapped in the face, and beaten and bruised by "rubber sticks;" in 2000 she was detained for three days and punched in the face, necessitating that she miss school and receive medical attention for her injuries. This increase in severity was accompanied by threats on her life, such as "you'll die in jail" and "you'll get it in the neck," and also threats of prolonged imprisonment and of forced prostitution that she believed had already been carried out on her first cousin. These threats were entirely credible in the context of her worsening abuse.

Consequently, no reasonable person in Emini's position could have thought that she was free to continue participating in political opposition without risking more grave physical injury or detention than she had already experienced. The majority itself acknowledges this. Yet the majority in essence requires that she wait until she was even more severely beaten or incarcerated even longer before she could claim she was politically persecuted. A need to show more severe treatment might be plausible if the mistreatment were occurring at random and with no explicit message that it would worsen if she continued her political activity. But when the handwriting was so clearly on the wall, Emini was not obligated to ignore it.

The socialist authorities ultimately achieved exactly what they sought: the suppression of Emini's political expression. Initially when she was imprisoned multiple times and beaten, she still continued in her opposition. The record shows that for years Emini was willing to persevere even through increasing physical harm, accepting that her harms were collateral for her cause. But finally she became certain that the harm resulting from her continued expression would be more than she could bear, and she fled Albania. The authorities succeeded by pushing her to the limit of what she was willing to risk: her life. And yet the majority seems to find that inadequate for asylum. While it is inescapable that we must sometimes engage in a grotesque calculation of a petitioner's harm to determine if it is severe enough to warrant asylum, *see Dandan*, 339 F.3d at 573-74, I fear that in this case the majority has set the bar too high. It engages in an overly-demanding search for specificity and severity, a formalism that undermines the purpose and function of our asylum law in cases in which the causal connection between political expression and inflicted harm is so high, and the clarity of increased future severity is apparent from context. If Emini's case does not warrant asylum, then it becomes very hard to identify just what does. The danger of this uncertainty extends beyond the fate of a single petitioner; it tends toward incongruous results that can give the appearance of asylum as judicial fiat rather than the promise of our government to the oppressed.

Because the record compels the conclusion that Emini's experiences amount to past persecution, she is therefore entitled to a presumption of a well-founded fear of future persecution should she be returned to Albania. I would grant her petition for review, vacate the decision of the BIA, and remand for a new hearing in which she would receive the benefit of that rebuttable presumption.