In the

# United States Court of Appeals

### For the Seventh Circuit

No. 12-2424

BIKRAMJEET SINGH, also known as
VIKRAM SINGH,

*Petitioner,*

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent.*

Petition for Review of an Order of
the Board of Immigration Appeals.
No. A075 309 330

ARGUED JANUARY 25, 2013—DECIDED JUNE 21, 2013

Before EASTERBROOK, *Chief Judge*, and BAUER and
KANNE, *Circuit Judges*.

KANNE, *Circuit Judge*. In 1996, Bikram[1] Singh came to
the United States. He had fled India to escape police

---

[1] The caption refers to the petitioner as "Bikramjeet Singh,"
but Singh testified that his correct first name is "Bikram."
(R. at 273.)

officers allegedly trying to kill him. After Singh had lived in this country for over thirteen years, an Immigration Judge ("IJ") denied Singh's requests for asylum, withholding of removal, and relief under the Convention Against Torture. Singh appealed this decision to the Board of Immigration Appeals ("BIA"), which affirmed. Singh subsequently petitioned this court for review. Although we find the agency's conclusions about past persecution problematic, we agree that Singh does not have a well-founded fear of future persecution. Accordingly, we deny his petition for review.

## I. BACKGROUND

This case's complex procedural history involves a vacated *in absentia* order, a change of venue, and the voluntary dismissal of an application for permanent residency. These details, however, do not bear on this appeal. Thus, we begin simply by mentioning that on December 15, 1997, Bikram Singh was sent a Notice to Appear in removal proceedings. (R. at 27.) The notice charged Singh with being subject to removal "as an alien present in the United States without being admitted or paroled." (*Id.*) Singh confessed to the charges, (*id.* at 174), but sought to prevent his deportation by applying for asylum on account of his religion and political opinions, (*id.* at 313). Singh also applied for withholding of removal and protection under the Convention Against Torture. (*Id.* at 309-19.) After holding an administrative hearing on September 23, 2009, IJ Craig Zerbe denied relief on all grounds. (*Id.* at 40-41.)

The IJ detailed several fact-specific reasons for his decision. We therefore recount the relevant details of Singh's testimony that the IJ found credible. In 1994, when Singh was fourteen years old and living with his family in India's state of Punjab, he witnessed a disturbing event. One evening, while watering his family's fields, Singh saw police officers drive up, drag two men of unknown identities into the field, and kill them. (*Id.* at 260-62.) Realizing that Singh had witnessed the murders, the police seized Singh and took him into custody. (*Id.* at 262.) Two days later, however, Singh's family convinced the police to release him. (*Id.*) The police did not harm Singh during this detention.

After the arrest, Singh and his family continued about their lives. Singh's father remained active in the Akali Dal, a political party known to advocate for an independent Sikh state. (*Id.* at 258.) Singh himself had not officially joined the Akali Dal, but he collected funds for the party. (*Id.* at 259.) Singh's father was also active in another Sikh political organization, the All-India Sikh Student Federation ("AISSF"). (*Id.* at 276.) Singh could not join this group either—he was too young. (*Id.*) Nevertheless, Singh helped the AISSF by serving beverages to members at meetings and going door-to-door to promote the organization. (*Id.* at 278.)

At the time, these Sikh organizations were unpopular among many non-Sikh Indians. According to the U.S. State Department, the tension stemmed back to 1984. (*Id.* at 374.) In June of that year, then-Prime Minister Indira Gandhi ordered military forces to attack the holiest

shrine in Sikhism, Amritsar's Golden Temple, which militants had begun using as a cache. (*Id.*) Hundreds died in the siege, and, in response, two of Gandhi's Sikh bodyguards assassinated her. (*Id.*) The assassination spurred riots and widespread animosity toward Sikhs. (*Id.* at 374-75.) Thus, throughout the rest of the 1980s and 90s, "Sikhs affiliated with Sikh political organizations such as the Akali Dal and the All-India Sikh Student Federation . . . were routinely subjected to severe human rights abuses including torture, arbitrary arrest, and summary killings." (*Id.* at 375.)

Singh represents one example of that dark history. After the 1994 arrest, the police detained Singh twice more. The next arrest occurred in 1995: Singh was held for four days, beaten with sticks, and ordered to tell his father to leave the Akali Dal. (*Id.* at 262-63.) The third arrest occurred in 1996. (*Id.* at 266.) This final time, the police held Singh for two days, beat him, and put chili powder in his wounds. (*Id.* at 266-67.) The police also threatened to stage an encounter in which they would kill Singh if he did not abandon the Akali Dal. (*Id.* at 266.) After that last arrest, Singh's family arranged for him to leave the country. (*Id.* at 267.)

Singh came to the United States. He now claims that he cannot return to India because the alleged persecution he suffered makes him fear receiving similar abuse upon return. To further support this claim, Singh testified that police officers still ask his family in India about him. (*Id.* at 270-71.) Singh's reasoning, however, did not persuade IJ Zerbe. The IJ found that Singh's

encounters with the Punjabi Police did not amount to past persecution. (*Id.* at 38-39.) He also found that Singh did not have a well-founded fear of future persecution due to great changes in India since the time Singh left. (*Id.* at 39-40.) Specifically, as IJ Zerbe noted, violence against Sikhs has largely ended. (*Id.*) Symbolizing the now "quiescent" state of affairs, the current Prime Minister of India is a practicing Sikh. (*Id.* at 40.) Finally, IJ Zerbe also found that Singh could easily relocate within India, even if Sikhs in Punjab continued to face violence. (*Id.*) For all these reasons, IJ Zerbe denied Singh any relief. (*Id.* at 40-41.)

Singh sought review by the Board of Immigration Appeals. In that proceeding, Singh challenged the credibility of the IJ's sources, the conclusion that Singh had not experienced past persecution, and the finding that conditions in India had changed substantially. (*Id.* at 153-59.) These arguments did not convince the BIA, which affirmed the decision below in a brief opinion. (*Id.* at 78-80.) Singh now appeals that decision.

## II. ANALYSIS

Before beginning, we note that, in the time between oral arguments and the issuing of this opinion, Singh was removed from the United States. His removal, however, does not make this case moot. *Hor v. Gonzales*, 421 F.3d 497, 498 (7th Cir. 2005). Rather, there is still a live, active controversy with real consequences. For example, if we granted Singh's petition for review and remanded

his case, then Singh could challenge his deportation and potentially seek readmission to the United States. *See Peralta-Cabrera v. Gonzales*, 501 F.3d 837, 842-43 (7th Cir. 2007). Therefore, we still address the merits of Singh's claims.

*A. Asylum*

Under 8 U.S.C. § 1158(b), both the Secretary of Homeland Security and the Attorney General have authority to grant asylum to refugees. Yet before either official can exercise this power, an applicant must satisfy the definition of a "refugee"—a person "unable . . . to return to" her former country as a result of either "persecution or a well-founded fear of persecution." 8 U.S.C. § 1101(a)(42)(A). Although the statute says "or," which implies that either past or future persecution suffices, our cases show that "and" more accurately describes what is required. *See Balliu v. Gonzales*, 467 F.3d 609, 612 (7th Cir. 2006). In other words, an asylum claim based on past persecution generally will not succeed unless the applicant *also* has a well-founded fear of future persecution. *See id.*

Initially, applicants can satisfy the well-founded fear requirement through a presumption: those who demonstrate past persecution are presumed to also have a well-founded fear of future persecution. 8 C.F.R. § 208.13(b)(1). The government, however, can rebut that presumption. To do so, the government must prove one of two things by a preponderance of the evidence: (1) "that there has been such a 'fundamental change in circumstances' in

the applicant's country that the applicant's fear of persecution is no longer well-founded"; or (2) "that the applicant 'could avoid future persecution by relocating to another part of the applicant's country.'" *Sosnovskaia v. Gonzales*, 421 F.3d 589, 593 (7th Cir. 2005) (internal citation omitted) (*quoting* 8 C.F.R. § 208.13(b)(1)(i)).

When the government rebuts the presumption, an asylum application fails, unless the petitioner's case falls into a narrow exception in which past persecution alone suffices. 8 C.F.R. § 208.13(b)(1)(iii). We refer to this kind of asylum as "humanitarian asylum." *Brucaj v. Ashcroft*, 381 F.3d 602, 608 (7th Cir. 2004). To qualify, the applicant must show either (1) "compelling reasons for being unwilling or unable to return to the country arising out of the severity of the past persecution" or (2) "a reasonable probability that he or she may suffer other serious harm upon removal to that country." 8 C.F.R. § 208.13(b)(1)(iii). Only "rare cases" meet this standard. *Toptchev v. INS*, 295 F.3d 714, 721 (7th Cir. 2002).

All the above hinges upon how one defines "persecution." We have said that persecution "must threaten death, imprisonment, or the infliction of substantial harm or suffering." *Boci v. Gonzales*, 473 F.3d 762, 766 (7th Cir. 2007). Furthermore, in order to meet the statutory requirements, persecution must be on account of a protected status, namely "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A).

In this case, IJ Zerbe found that Singh did not meet any of the discussed standards: Singh had not suffered

past persecution, had no well-founded fear of future persecution, and did not qualify for humanitarian asylum. The BIA affirmed with a brief opinion that merely agreed with the IJ's reasoning. Consequently, we base our review on "the IJ's opinion, as supplemented by the BIA's opinion." *Borovsky v. Holder*, 612 F.3d 917, 920 (7th Cir. 2010). When considering the agency's decision, we review for substantial evidence. *Gjerazi v. Gonzales*, 435 F.3d 800, 807 (7th Cir. 2006). Thus, we will reverse the finding below "only if the record compels a contrary result." *Borovsky*, 612 F.3d at 921 (internal quotation marks omitted).

*1. Past persecution*

IJ Zerbe and the BIA concluded that Singh had not suffered past persecution. This finding troubles us. The IJ and BIA relied heavily on *Dandan v. Ashcroft*, a case in which Syrian forces arrested the petitioner and detained him for three days. 339 F.3d 567, 571 (7th Cir. 2003). During the arrest, authorities gave Dandan minimal food and water; they also beat him until his face became "swollen." *Id.* at 574. The BIA found that these events did not qualify as past persecution, and we affirmed because the record did not compel a contrary conclusion. *Id.* Our decision stemmed from two related reasons: (1) Dandan was detained only once; and (2) his petition lacked specific details. *Id.* at 573-74.

Here, however, neither reason applies. First, the Punjabi Police arrested Singh three times and beat him

twice. Frequency of past abuse "figure[s] significantly" in determining whether actions rise to the level of persecution. *Id.* at 573. Thus, the fact that Singh was abused multiple times immediately distinguishes this case from *Dandan*.

Second, Singh provided greater details of his abuse. Dandan only testified that he was beaten and that his face became swollen, whereas Singh testified to much more. To see the difference, consider the more apt comparison between the situation here and the one in *Irasoc v. Mukasey*. 522 F.3d 727 (7th Cir. 2008). Irasoc was detained two days and beaten several times, including one time that he was kicked in the groin so severely he lost consciousness. *Id.* at 728-29. That level of detail compelled us to reverse the finding that Irasoc had not suffered past persecution. *Id.* at 730. Here, the quantity and quality of details is comparable. Singh was detained for a total of eight days over the course of three arrests—even longer than Irasoc. During two of those arrests, Singh was beaten, and on one of those occasions, chili powder was rubbed in his wounds. Finally, during the last arrest, Singh received death threats.

*Irasoc* therefore seems to indicate that the record compels a conclusion contrary to the agency's. We thus have grave doubts about the IJ's finding that Singh did not suffer past persecution. We need not definitively decide the question, however. Rather, we can, for current purposes, assume that Singh suffered past persecution, because we still affirm the agency's decision on the grounds that Singh lacked a well-founded fear of future persecution.

*2. Well-founded fear of future persecution*

As noted above, when a petitioner has endured past persecution, we presume he also has a well-founded fear of future persecution. 8 C.F.R. § 208.13(b)(1). The government, however, can rebut this presumption if a preponderance of the evidence shows either (1) "a fundamental change in circumstances" in the applicant's home country that refutes a fear of persecution upon return; or (2) the applicant can "avoid future persecution by relocating to another part of" his home country. 8 C.F.R. § 208.13(b)(1)(i).

The IJ and BIA did not give Singh the benefit of this presumption because they found that the past abuse he endured did not qualify as persecution. As discussed, however, we have doubts about that finding. As a result, we assumed Singh suffered past persecution and must accordingly also presume he has a well-founded fear of future persecution. At first, our decision to apply the presumption might seem to warrant remanding the case. As a general matter, we refrain from ruling on grounds that the agency did not consider. *See, e.g.*, *INS v. Ventura*, 537 U.S. 12, 16-18 (2002) (*per curiam*); *Kone v. Holder*, 620 F.3d 760, 763-64 (7th Cir. 2010). That practice allows the agency to apply its special expertise when the issue is considered for the first time. *See Ventura*, 537 U.S. at 16-18.

We do not need to remand here, however. The BIA specifically included an alternative holding that addressed the reasoning we follow below: even if Singh were presumed to have a well-founded fear of future

persecution, "the Immigration Judge's findings with regard to change[d] country conditions in India and availability of internal relocation adequately rebutted" the presumption. (R. at 46 n.5.) We cannot see why the BIA would change this decision if we remanded. Singh's brief to the BIA argued that he was entitled to a presumed fear of future persecution but that the contrary evidence did not rebut that presumption. (R. at 156-58.) Thus, the BIA heard Singh's arguments about the relative strength of each side's evidence before reaching its alternative conclusion. It is therefore proper for us to review the BIA's finding. In so doing, we will again review for substantial evidence. *Brucaj*, 381 F.3d at 607.

As a final note before addressing the merits, the above discussion also explains why we reject the government's claim of procedural default. Under 8 U.S.C. § 1252(d)(1), an applicant must exhaust administrative remedies before seeking judicial review. Thus, if the BIA can provide relief on a claim, an applicant must present that issue to the BIA before presenting it to us. *Muratoski v. Holder*, 622 F.3d 824, 830-31 (7th Cir. 2010). Here, the government contends that Singh's petition to the BIA did not challenge the finding that Singh could relocate within India, which would mean that Singh failed to exhaust his claim. Yet, as discussed, Singh argued to that BIA that he did not need to show an inability to relocate. (R. at 157.) If the government did not present enough evidence to overcome Singh's presumed fear of future persecution, Singh could have won without making any affirmative arguments about

moving. Singh therefore raised the issue of whether the government adequately rebutted his presumed fear of future persecution. Nevertheless, even though we may consider Singh's claim, we still find that substantial evidence supports the BIA's alternative holding.

### a. Changed country conditions

The government's many sources demonstrated that Singh no longer has a well-founded fear of future persecution as a result of significant changes in India. *See* 8 C.F.R. § 208.13(b)(1)(i)(A). For example, a 2008 U.S. State Department report explained that "conditions for Indian Sikhs differ dramatically from those of the 1980s and 1990s." (R. at 375.) The report went on to describe symbols of this change—that "Sikhs have ascended to the highest levels of the Indian government," including the current Prime Minister, Manmohan Singh, as well as other "high ranking . . . generals and members of parliament." (*Id.*) The report did acknowledge that police conduct makes "human rights abuses . . . a legitimate threat to all Indians," but also specifically said that "[t]here is no indication . . . Sikhs are singled out for such abuse or that such abuse occurs with either the overt or tacit consent of the Government of India." (*Id.*)

Another helpful source was a 2009 report by the U.S. Citizenship and Immigration Services's Country of Origin Information Research Section ("COIRS"). Like the State Department, COIRS spoke to the "significant improvements in the human rights situation for Sikhs" in India. (*Id.* at 405.) The report from COIRS also went

into further detail about the specific situation in Punjab, Singh's home state. The report stated that "well-known Sikh separatists have . . . returned to Punjab without incident." (*Id.* at 406.)

The report, however, also included less optimistic details. One quoted expert stated that some Sikh separatists have been arrested in response to "overtly public acts of protest or expression" and were then abused by police. (*Id.*) This statement seems supported by a few short news articles submitted by Singh that discuss Punjabi Police efforts to contain Sikh protesters. (*Id.* at 48-74.) Yet, other sources in the COIRS report indicate that such incidents are isolated. Amnesty International, for example, stated that the Punjabi Police continue to abuse "the poor, *Dalits* ("untouchables"), women, and human rights activists," but did not specifically mention Sikhs. (*Id.* at 406.) The COIRS report also stated that "neither Amnesty International nor Human Rights Watch have reported any specific abuses directed against Sikhs by the governments of India or Punjab . . . over the past two years." (*Id.* at 410.) Thus, although these sources indicate that conditions are not perfect in India, they show that substantial evidence supports the BIA's conclusion: changed country conditions refute Singh's presumed fear of future persecution.

Singh's news articles and the expert statements about arrested Sikh separatists do not persuade us otherwise. These sources specifically addressed the situation in Punjab. Indeed, perhaps they speak to Singh's response to the government's evidence—that India's

changed political climate "does not make a difference," given that Punjab had a Sikh in charge when Singh left. (*Id.* at 270.) Yet, even if Punjab still has vestiges of abuse, the country as a whole differs dramatically. Additionally, continued difficulties in Punjab would not negate the BIA's finding that Singh could reasonably relocate, which we discuss below.

### b.  Ability to relocate

The government also demonstrated that Singh could both reasonably and safely relocate within India. *See* 8 C.F.R. § 208.13(b)(1)(i)(B); *see also Oryakhil v. Mukasey*, 528 F.3d 993, 998 (7th Cir. 2008). Singh argued that the Punjabi Police have continued to ask about him, that they "never forget," and that they would track him down wherever he moved. (R. at 270.) The BIA concluded that the government's sources showed otherwise, and, once again, this conclusion is supported by substantial evidence.

The 2008 State Department report said that Indian "law provides for freedom of movement, and the government generally respect[s]" this right. (*Id.* at 352.) The report did note that the Indian government sometimes limits the ability of Sikh separatists to travel abroad, (*id.* at 352-53), but that restriction would not prevent Singh from relocating *within* India. The Immigration and Refugee Board of Canada further buttresses this conclusion; it found that "internal relocation is not a problem for Sikhs in India." (*Id.* at 406.)

The COIRS report proves even more helpful because it addresses Singh's argument about being followed. The report mentioned that "high-level members and activists of the Akali Dal . . . are still prone to be arrested." (*Id.* at 417.) In fact, these people may need to worry about being followed, as Singh argued. (*Id.* at 421.) The police, however, have limited their interest to high-ranking members, especially "hard-core militants." (*Id.*) Only a "very small" number of people garner such attention. (*Id.*)

Substantial evidence supports the Board's conclusion that Singh would not fall among that group. As a young teenager in Punjab, Singh had no official membership in any Sikh secessionist organizations. He displayed minimal involvement while in India and has not pursued anything further since entering the United States. (*Id.* at 279-80.) Singh could have been considered, at most, a rank-and-file member of these organizations. Furthermore, any involvement he had ended nearly two decades ago. Given these facts, Singh does not have an objectively reasonable fear of attracting significant police attention.

Singh's claim that the police still ask for him does not lead us to a contrary conclusion. Just because the police remain interested in Singh does not mean they consider him the kind of high-profile member they would follow across a subcontinent. It is notable, for example, that Singh's father, who was far more actively involved than Singh in these targeted political groups, has safely relocated within India. (*Id.* at 256); *see also*

*Toptchev*, 295 F.3d at 722 (when family members who share the alleged grounds for persecution safely relocate within a country, that fact undercuts petitioner's fear of future persecution). We thus have no reason to doubt Singh's ability to find another place to live within a country as vast as India. Substantial evidence supports the BIA's conclusion, and, accordingly, this record does not compel reversal.

Singh disputes this conclusion and argues that the BIA did not even have the correct country in mind when deciding his case. Yet the preceding analysis shows why this argument fails. The BIA mentioned India several times in its brief opinion, (R. at 78-80), and referenced country-specific reasons from the IJ's opinion, such as the fact that the current Prime Minister is a practicing Sikh, (*id.* at 79). The only support Singh can find for his argument is one sentence in the final paragraph of the BIA's opinion, which mistakenly referred to Singh's home country as China. (*Id.* at 80.) Singh begins his opening brief by calling this error a "[m]ischaracterization" of such "severity" that it constitutes reversible error. (Pet'r's Br. at 11.) Although we understand the offense Singh took to such carelessness, it is still more than clear, based upon the BIA's opinion as a whole, that the agency used the correct facts when evaluating Singh's claim. This obvious typo is not reversible error. *See United States v. Marion*, 590 F.3d 475, 476 n.1 (7th Cir. 2009) (overlooking a "simple typo" when it was "readily apparent from the other parts" of the decision below that the court had nonetheless understood and properly analyzed the arguments presented to it).

*4. Humanitarian asylum*

Although Singh has no well-founded fear of future persecution, we must also assure ourselves that his situation does not qualify for humanitarian asylum—the narrow set of cases in which past persecution alone suffices. The IJ found that Singh's case did not meet this standard, (*id.* at 39-40), and the record does not compel otherwise.

To qualify for humanitarian asylum, Singh's persecution needed to have "been so outrageous (like the Nazi treatment of the Jews) that a compelled return . . . even with . . . apologies from one's former persecutors would be a cruelty." *Haile v. Holder*, 591 F.3d 572, 575 (7th Cir. 2010); *see also Asani v. INS*, 154 F.3d 719, 724 (7th Cir. 1998) (describing that a petitioner must suffer a "sever[e]" "level of atrocity" to qualify for humanitarian asylum). We by no means want to minimize the suffering that Singh has endured, but his case does not approach that standard. Substantial evidence supports the BIA's conclusion: it would not be inhumane to return Singh to India based upon his past encounters with the Punjabi Police. *See* 8 C.F.R. § 208.13(b)(1)(iii)(A). Similarly, the record does not provide reason to believe that Singh will face harm upon his return to India. *See* 8 C.F.R. § 208.13(b)(1)(iii)(B).

*B. Withholding of Removal and Protection under the Convention Against Torture*

As we have said many times before, withholding of removal and protection under the Convention Against Torture are more limited remedies than asylum. *See, e.g.,*

*Hao Zhu v. Gonzales*, 465 F.3d 316, 322 (7th Cir. 2006); *Ahmed v. Ashcroft*, 348 F.3d 611, 619 (7th Cir. 2003). Therefore, a party who does not qualify for asylum necessarily does not qualify for these remedies either. *See, e.g.*, *Mekhtiev v. Holder*, 559 F.3d 725, 731 (7th Cir. 2009); *Dandan*, 339 F.3d at 575 n.7. Because we have upheld the BIA's decision to deny asylum, Singh is also not entitled to these other forms of relief.

## C. Credibility Determination

Although this record does not compel reversal, we do feel compelled to note IJ Zerbe's conduct during the administrative hearing. As a means of testing religious belief, IJ Zerbe questioned Singh on the tenets of Sikhism using information gathered from Wikipedia. (R. at 36 n.2); (*id.* at 299). For example, IJ Zerbe asked Singh about the symbolism behind certain objects revered in Sikhism, the reasons for particular traditions, and Singh's compliance with rules that Sikhs must follow. (*Id.* at 294-301.) Throughout the exchange, Singh attempted to explain what he understood these religious beliefs to mean and why he did not follow certain practices. IJ Zerbe, however, seemed only interested in answers that parroted back the exact language of the Wikipedia entry. Based upon Singh's divergence from that text, Zerbe doubted Singh's claim to be a Sikh. (*Id.* at 35-36.)

IJ Zerbe's behavior was inappropriate. As we have said in the First Amendment context, "a sincere religious believer doesn't forfeit his religious rights

merely because he is not scrupulous in his observance; for where would religion be without its backsliders, penitents, and prodigal sons?" *Grayson v. Schuler*, 666 F.3d 450, 454 (7th Cir. 2012). The same is true here. How many Christians would struggle to recite the Ten Commandments in order? Or to follow them every day? How many Jews might not know the symbolism behind each component of the Seder? Do these foibles make individuals any less sincere in their beliefs?

We think not. Rather than seeking a verbatim recitation of an encyclopedia article, IJs should listen to a petitioner's personal explanation of religious beliefs. IJs, like district court judges, are in the best position to evaluate a witness's credibility. They should use that advantage to thoughtfully consider a petitioner's tone, words, and demeanor, as well as other indicia of reliability. The IJ's evaluation of whether a witness is a member of a religion should flow from these observations—not simply from the ability (or inability) to recall doctrine. Orthodoxy is no substitute for sincerity.

### III. CONCLUSION

For the foregoing reasons, we DENY Singh's petition for review.